IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 5, 2009 Session

## STATE OF TENNESSEE v. BENJAMIN BROWN

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 96-13456     Carolyn Wade Blackett, Judge**

---

**No. W2006-02762-SC-R11-CD - Filed May 27, 2010**

---

The defendant was convicted of aggravated child abuse and felony murder in the perpetration of aggravated child abuse. The defendant appealed the felony murder conviction, and the Court of Criminal Appeals affirmed his conviction. We granted permission to appeal and address the issue of whether the trial court committed reversible error by failing to instruct the jury on the lesser-included offenses of felony murder, which include second degree murder, reckless homicide, and criminally negligent homicide. We conclude that the trial court erred by failing to instruct the jury as to these lesser-included offenses, and accordingly, we reverse the felony murder conviction and remand the case for a new trial on the felony murder count.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed and Case Remanded to the Criminal Court for Shelby County**

SHARON G. LEE, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellant, Benjamin Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and John Wheeler Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The first marriage of Benjamin Brown ("the defendant") and Tammy Huff was very brief. They were wed on April 26, 1994, at the home of Ms. Huff's parents in Hernando, Mississippi. On the evening of the wedding, Ms. Huff's father received an anonymous telephone call from a woman who claimed that the defendant was the biological father of her children. Upon learning this information, Ms. Huff, who was pregnant with the defendant's child, left the defendant and later divorced him.

On September 16, 1994, Ms. Huff gave birth to a daughter, Ashley Denise ("Ashley"), and they resided with Ms. Huff's parents in Hernando until the summer of 1996. For about twenty months, the defendant had no contact with his ex-wife and daughter. However, in May of 1996, Ms. Huff and the defendant began seeing each other again and reconciled. On July 12, 1996, they remarried. On August 2, 1996, the defendant, Ms. Huff, and Ashley moved into an apartment in Memphis.

The second marriage was troubled. On September 12, 1996, after only two months of marriage, Ms. Huff decided to leave the defendant. She called her parents and told them she wanted to return home. The defendant, after overhearing Ms. Huff's telephone conversation, became angry and according to Ms. Huff, "like started choking me." Ms. Huff got away from the defendant and began packing. She testified that when she told the defendant that she was leaving him because he was "mean" and she didn't trust him, his "eyes like turned red, and . . . he started coming after me. . . ." Ms. Huff testified that the defendant then placed a knife at her throat and said, "If you leave me, you know, I can, you know, I can kill you. I don't have anything to lose." When the defendant demanded that Ms. Huff call her parents back and tell them she had changed her mind about coming home, she did so because the defendant "was threatening me and I was scared."

The next morning, the defendant drove Ms. Huff and Ashley to Ashley's daycare center. After Ms. Huff took Ashley into the center, the defendant drove Ms. Huff to her job and then went to his own place of employment. At or around 12:30 p.m., the defendant picked up Ashley from the daycare center. The director of the center, who had worked with Ashley on a daily basis during the several weeks Ashley had been in attendance, testified that Ashley was "perfectly well" when she left the center that day. The director said that she never had any indication that Ashley was the victim of child abuse during the weeks Ashley had been in her care.

2

Ashley and the defendant were together the rest of that afternoon. The defendant testified that they went to a 4:30 p.m. appointment at an insurance company and then to the home of his cousin. While the defendant and Ashley were at the cousin's house, the cousin said Ashley played with a child from next door and appeared to be all right and that the defendant was "cheerful, laughing" and "in good spirit." The cousin also said that he had known the defendant all of his life and had never seen him scold or whip a child. At or around 6:00 or 6:30 p.m., the defendant bought some fast food, and he and Ashley went to Ms. Huff's workplace where the three ate dinner together in the car. Ms. Huff returned to work, and the defendant and Ashley returned to the family's apartment.

At or around 8:00 p.m., Rita Griffin, who resided across the hall from the defendant, was returning to her apartment. The apartments were accessed by an outside metal and concrete stairway, and, as Ms. Griffin reached the top of this stairway, she saw the defendant leaving his apartment with Ashley on his left shoulder. She spoke to him briefly before entering her apartment and did not notice anything unusual about the defendant or Ashley at this time. Ms. Griffin was unable to see Ashley's eyes at this time, as Ashley did not raise her head from the defendant's shoulder and appeared to be asleep.

The defendant testified that after meeting Ms. Griffin and as he went down the stairway, he realized that he had left his keys in his apartment. When he returned to the apartment, he left Ashley alone on the landing outside the door while he went inside. The defendant maintains that when he came out of the apartment about a minute later, he saw Ashley lying at the bottom of the stairway.

Meanwhile, immediately after entering her apartment, Ms. Griffin made a telephone call but was interrupted after approximately two minutes by someone beating on her door. When she asked who was at her door, the defendant identified himself and said, "My baby has fallen down the stairs." Ms. Griffin opened the door to the defendant, whom she described as appearing "very upset." He entered her apartment with Ashley in his arms. She was not moving. Ms. Griffin stated that the defendant was "rocking [Ashley] like 'Ashley, Ashley, wake up.'" He told Ms. Griffin that he had set Ashley on the steps and had gone back into the apartment to get his keys and that when he came out of the apartment, Ashley "was on the ground. She had fallen down the steps." Ms. Griffin dialed 911 for medical assistance, and while she was speaking to the 911 operator, the defendant was shaking Ashley "like 'Ashley, Ashley, please wake up. . . .'" The 911 operator advised Ms. Griffin to tell the defendant to stop shaking Ashley and to lay her down and keep her warm. Ms. Griffin testified that Ashley "was unconscious and her eyes were kind of trying to open and she was gasping for breath, but she couldn't really get her breath." Ms. Griffin was able to see Ashley's legs and arms and did not notice any abrasions, bruises, or blood on her. After laying Ashley down on the floor, the defendant began attempting to perform

3

cardiopulmonary resuscitation on her. Paramedics arrived and transported Ashley to LeBonheur Hospital, where she was admitted to the emergency room and later to the intensive care unit. Over the next several hours, Ashley's neurologic condition deteriorated, her brain ceased to function, and at 11:55 p.m. on September 15, 1996, she died of heart and lung failure.

On December 19, 1996, a Shelby County Grand Jury returned two indictments charging the defendant with one count of aggravated child abuse in violation of Tennessee Code Annotated section 39-15-402[1]; one count of first degree murder in the perpetration of aggravated child abuse in violation of Tennessee Code Annotated section 39-13-202(a) (2)[2]; and one count of premeditated first degree murder, in violation of Tennessee Code Annotated section 39-13-202(a)(1).[3] The case was tried by a jury from April 26 through April 30, 1997.

---

[1] Tennessee Code Annotated section 39-15-402 (1991 & Supp. 1996) provided in pertinent part:

> (a) A person is guilty of the offense of aggravated child abuse who commits the offense of child abuse as defined in § 39-15-401 and:
> (1) The act of abuse results in serious bodily injury to the child[.]

Tennessee Code Annotated section 39-15-401(a) (Supp. 1996) provided, "Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare is guilty of a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony."

[2] Tennessee Code Annotated section 39-13-202 (Supp. 1996) provided in pertinent part:

> (a) First degree murder is:
>
> . . .
>
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse . . . .
>
> (b) No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts . . . .

[3] Tennessee Code Annotated section 39-13-202(a)(1) provided that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another[.]"

4

At trial, Dr. Jeffrey Schmidt, the pediatric intensive care physician who treated Ashley in the intensive care unit, testified that he observed "[n]o scratches, bruises, bumps, no swelling, no cuts" but that she was suffering from "severe neurologic devastation, severe brain injury." He stated that brain injury is evaluated according to the Glasgow Coma Scale, an objective standard for measuring brain function along a continuum which begins at three, indicating no brain function, and ends at fifteen, indicating normal brain function. According to Dr. Schmidt, Ashley scored only four on this scale. He attested that a computerized axial tomography (CT) scan of Ashley's brain showed no abnormality but that she exhibited retinal hemorrhages in the backs of her eyes and that this combination of symptoms was consistent with "acceleration-deceleration syndrome," commonly referred to as "shaken baby syndrome." He further explained as follows:

> The brain sits in a fluid filled sac called the dura. And especially in little children and babies, the ability for the brain to move within that sac is far more than adults. In fact, in adults it doesn't move much at all. In babies it can move enough that the connections between the brain and the dura, the tiny blood vessels can get sheared. The other – the nerve fibers, too, and the nerve cells can get sheared if there's a sudden impact or acceleration-deceleration force. And then that's also the same explanation for the tiny vessels in the back of the eye. Because of a sudden acceleration-deceleration force, these tiny vessels get ruptured and cause the bleeding, the hemorrhages in the back of the eye.

Dr. Schmidt testified that the only other circumstances that produce the injury exhibited by Ashley are "major trauma like high-speed motor vehicle accidents . . . [or] falls from extreme heights" such as from "three or four-story windows" or "off of . . . 50-foot cliffs." Dr. Schmidt denied that a fall down a flight of thirteen stairs, the number of stairs from the landing of the defendant's apartment to ground level, would have generated sufficient force to produce Ashley's injury, which would have required "much higher speeds of acceleration and much greater impact for deceleration." He denied that the defendant's shaking of Ashley after he brought her into Ms. Griffin's apartment would have created sufficient force to cause Ashley's injury. Dr. Schmidt described the kind of shaking necessary to generate such force as "extreme, severe, out of control." He further testified that "retinal hemorrhage would not [be] see[n] from a fall down the stairs" and that if Ashley had fallen down the aggregated concrete and metal steps, he would expect to have found "either bruising, bleeding, cuts, abrasions, something that would show that her head struck . . . the step or . . . some evidence of external trauma." Dr. Schmidt stated that, given the absence of external injury to Ashley's head, "the only thing that would achieve that degree of neurologic injury is the shaking that

5

would cause the severe damage to the brain cells." Dr. Schmidt was unable to say whether shaken baby syndrome symptoms could result if a child fell directly on its head from a sufficient height but speculated that the syndrome could result "if a patient fell and they landed on their butt first, but their head snapped, . . . if the acceleration was high enough and the impact was high enough."

Forensic pathologist Dr. Wendy Gunther testified that she performed an autopsy of Ashley's body on the day following her death. Upon examining Ashley's eyes and brain, Dr. Gunther discovered that there was bleeding at the backs of the eyes and determined that when Ashley died, all of her brain neurons were either dying or already dead. The doctor discovered no abrasions, lacerations, or fractures. She found "a tiny scar" on Ashley's left arm "with five, tiny white dots like some animal might have bitten her" and a small bruise on the back of her left arm. Finally, upon opening the skin of Ashley's buttocks, Dr. Gunther discovered severe bruising which resulted in bleeding throughout the subcutaneous fat. Although the defendant attested that he had never spanked Ashley and Ms. Huff admitted that she had no knowledge that he had ever "spank[ed] or beat or mistreat[ed]" Ashley, Dr. Gunther described this bruising as "consistent with somebody having struck [Ashley] repeatedly on the buttocks." However, she also conceded that the bruising could have been caused by "a very unusual fall, if the child managed to fall so that from the small of her back to the area where her buttocks turn under and side to side, all hit some surface at the same time." Dr. Gunther found no pattern bruising on Ashley's buttocks and noted that "sometimes when a child is struck or whipped by a parent you see pattern bruises," stating that pattern bruises are quite common when a child was struck on the naked buttocks but more unusual if the child was dressed when struck. She explained that the external evidence of this severe bruising of the buttocks had been very hard to see because of Ashley's dark brown skin and because, after death, when a body is face up, blood collects in the back, causing everything to have a dark red appearance.

Based upon the information obtained from the autopsy, Dr. Gunther opined that "the only thing that could have killed [Ashley] is shaken baby syndrome." Dr. Gunther noted that in order to cause shaken baby syndrome, "you must shake the baby so hard that the baby's head whips back and forth and the axons of the neurons break." She stated that shaken baby syndrome is much more common in small babies and that to cause it in a child of Ashley's age, "you would have to shake [the child] extremely hard."

During trial, the State conceded that the count of premeditated first degree murder was not supported by the evidence, and that count was dismissed. At the close of proof, in discussion with the parties' attorneys outside the presence of the jury, the trial court indicated that because the first degree premeditated murder count had been dismissed, it was not necessary to charge the jury on second degree murder as a lesser-included offense, stating

6

"[o]nce you've knocked out murder one, then your second (degree) and everything went away." Counsel for the State voiced concern that the trial court might be required to charge the jury on criminally negligent homicide as "a lesser grade of homicide . . . even though it may not be a lesser-included [offense]." The trial court then deferred to the defendant's attorney who declined a request for a charge of criminally negligent homicide.

At the conclusion of closing arguments, the trial court charged the jury as to the offense of aggravated child abuse, the lesser-included offense of child abuse through injury of a child six years or less, and the offense of first degree murder in the perpetration of aggravated child abuse. The trial court did not instruct the jury as to any lesser-included offenses of felony murder.

The jury found the defendant guilty of aggravated child abuse and first degree murder in the perpetration of aggravated child abuse, and the defendant received a sentence of imprisonment for life for the felony murder conviction and a concurrent sentence of twenty-five years for the aggravated child abuse conviction. The defendant appealed the convictions to the Court of Criminal Appeals. Finding that the defendant had not filed a timely motion for new trial, the Court of Criminal Appeals held that it was without jurisdiction to hear any issues stemming from the felony murder conviction other than the issue of sufficiency of the evidence, which was found to be sufficient to support the conviction. State v. Brown, No. W1999-00327-CCA-R3-CD, 2000 WL 1664226, at *6, 8-9 (Tenn. Crim. App. Oct. 24, 2000). The Court of Criminal Appeals dismissed the conviction for aggravated child abuse, concluding that the convictions for aggravated child abuse and felony murder committed in the perpetration of aggravated child abuse violated constitutional protections against double jeopardy. Based on our decision in State v. Godsey, 60 S.W.3d 759 (Tenn. 2001), we concluded that dual convictions for aggravated child abuse and felony murder were permissible and did not violate protections against double jeopardy. We remanded the case to the Court of Criminal Appeals for review in light of our decision in Godsey, whereupon the intermediate appellate court affirmed the conviction for aggravated child abuse. State v. Brown, No. W1999-00327-CCA-R3-CD, 2002 WL 1869418 (Tenn. Crim. App. Aug. 8, 2002), no perm. app. filed. Thereafter, the defendant filed a petition for post-conviction relief seeking a delayed direct appeal.

By order of the post-conviction court, the defendant was granted a delayed appeal with respect to the indictment for felony murder and allowed thirty days to file a motion for new trial. The order provided that issues raised in the petition as to the indictment for aggravated child abuse would be held in abeyance pending resolution of the motion for new trial and delayed appeal relative to the felony murder indictment.

7

By motion for new trial and subsequent amendment, the defendant claimed, among other things, that the trial court erred by failing to instruct the jury as to any lesser-included offenses of felony murder.[4]  Upon denial of the motion by the trial court, the defendant appealed to the Criminal Court of Appeals, which held that the trial court did not err in failing to instruct the jury as to second degree murder or reckless homicide and that while the trial court did err in failing to instruct the jury as to criminally negligent homicide, such error was harmless.

We granted review in this case to determine whether the trial court erred in failing to instruct the jury on lesser-included offenses of felony murder and if so, whether such error was harmful.  After review, we hold that the trial court erred in failing to instruct the jury as to the lesser-included offenses of felony murder and that such error was harmful, warranting reversal of the conviction of felony murder and remand for a new trial as to that charge.

## Analysis

The defendant contends that the trial court should have instructed the jury as to second degree murder, reckless homicide, and criminally negligent homicide as lesser-included offenses of felony murder and that its failure to do so was harmful error.  We reiterated the importance of charging a jury as to lesser-included offenses in State v. Burns, 6 S.W.3d 453 (Tenn. 1999), where we noted that such a practice benefits the prosecution and the defense:

> At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged.  This rule originally developed as an aid to the prosecution in cases in which the proof failed to establish some element of the crime charged.  But it has long been recognized that it can also be beneficial to the defendant because it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal. . . . [P]roviding

---

[4] The motion for new trial also included a claim that the trial court erred by failing to take curative action or declare a mistrial based upon an allegedly improper and inflammatory reference to Ted Bundy and John Wayne Gacy made by the State during closing argument rebuttal.  This issue was also raised in the defendant's brief in this appeal.  We need not address this issue, however, because it has been rendered moot by our decision to reverse the trial court's judgment.

8

the jury with the "third option" of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard.

Id. at 464 (quoting Beck v. Alabama, 447 U.S. 625, 633-34 (1980)).

The statutory law of this state reflects the importance of properly instructing a jury with respect to lesser-included offenses. Tennessee Code Annotated section 40-18-110(a) (1997), applicable at the time of trial, imposed a duty upon the trial court to instruct the jury as to lesser-included offenses of the felony murder charge even in the absence of a request by the defendant:

> It is the duty of all judges charging juries in cases of criminal prosecutions for any felony wherein two (2) or more grades or classes of offense may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment, *without any request on the part of the defendant to do so*.[5]

Tenn. Code Ann. § 40-18-110(a) (emphasis added).

In addition, the well-established law of this state recognizes that the right to lesser-included offense instructions derives not only from statutory law, but also from the right to trial by jury as embodied at Article I, section 6 of the Tennessee Constitution, which provides that "the right of trial by jury shall remain inviolate." State v. Ely, 48 S.W.3d 710, 726-27 (Tenn. 2001) (citing State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998); State v. Staggs, 554 S.W.2d 620, 626 (Tenn.1977); Strader v. State, 362 S.W.2d 224, 230 (Tenn.1962)); see also State v. Davis, 266 S.W.3d 896, 902 (Tenn. 2008); State v. Richmond, 90 S.W.3d 648, 661

---

[5] Pursuant to amendment of this statute in 2001, the trial judge's duty to instruct as to lesser charges is now contingent upon a party's prior written request, and in its current manifestation, the statute states in pertinent part as follows:

> When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment.

Tenn. Code Ann. § 40-18-110(a) (2006 & Supp. 2009).

(Tenn. 2002); State v. Bowles, 52 S.W.3d 69, 77 (Tenn. 2001); State v. Belser, 945 S.W.2d 776, 790 (Tenn. Crim. App. 1996); State v. Howard, 926 S.W.2d 579, 585 (Tenn. Crim. App. 1996); State v. Summerall, 926 S.W.2d 272, 278 (Tenn. Crim. App. 1995); State v. Ruane, 912 S.W.2d 766, 783 (Tenn. Crim. App. 1995); State v. Lewis, 919 S.W.2d 62, 68 (Tenn. Crim. App. 1995).

In Bolden, we emphasized the mandatory nature of the duty to instruct on lesser-included offenses and that "neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged." Id. at 593 (quoting People v. Barton, 906 P.2d 531, 536 (Cal. 1995)).

We set forth in Burns various criteria for determining whether a particular offense is a lesser-included offense of the offense that is the subject of indictment. An offense qualifies as a lesser-included offense "if all of its statutory elements are included within the statutory elements of the offense charged; *or . . . it fails to meet [that] definition . . . only in the respect that it contains a statutory element or elements establishing . . . a different mental state indicating a lesser kind of culpability*." Burns, 6 S.W.3d at 466-67 (emphasis added). In Ely, 48 S.W.3d at 721-22 (Tenn. 2001), we held that "because the mental states required for the lesser offenses differ only in the level of culpability attached to each in terms of seriousness and punishment, the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder." See also State v. Locke, 90 S.W.3d 663, 669-70 (Tenn. 2002).

However, as we further indicated in Burns, our inquiry must proceed beyond the conclusion that an offense is a lesser-included offense. In order to properly decide whether a trial court has erred in failing to give jury instructions as to a lesser-included offense, we must also examine all of the evidence in the case and determine 1) "whether any evidence exists that reasonable minds could accept as to the lesser-included offense" and 2) whether "the evidence . . . is legally sufficient to support a conviction for the lesser-included offense." 6 S.W.3d at 469. In conducting this two-step analysis, we are required to "view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." Id. Further, we must bear in mind that the trial court's duty to instruct on a lesser-included offense is not contingent upon the lesser-included offense being consistent with the theory of the State or the defendant, as it is "[t]he evidence, not the theories of the parties, [that] controls whether an instruction is required." State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002).

We now consider whether the trial court should have instructed the jury on the lesser-included offense of second degree murder. As pertinent to this case, the statutory definition of second degree murder is "[a] knowing killing of another," Tenn. Code Ann. § 39-13-210

10

(a) (1991 & Supp. 1996), and "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (1991). Second degree murder is a result of conduct offense and accordingly, "[t]he 'nature of the conduct' that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000); see also State v. Page, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). To sustain a finding that a defendant acted knowingly, the State is not required to prove that the defendant wished to cause his victim's death but only that the defendant knew that his or her actions were reasonably certain to cause the victim's death. "'A person can act knowingly irrespective of his or her desire that the conduct or result will occur.'" State v. Kelley, 34 S.W.3d 471, 478 (Tenn. Crim. App. 2000) (quoting State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997)); see Tenn. Code Ann. § 39-11-302 sentencing comm'n cmts. ("A defendant acts knowingly . . . when he or she is . . . practically certain that the conduct will cause the result, irrespective of his or her desire that the . . . result will occur.")

Whether a defendant acted 'knowingly' in killing another is a question of fact to be addressed by the jury. State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); State v. Brunner, No. W2008-01444-CCA-R3-CD, 2009 WL 2151822, at *6 (Tenn. Crim. App. July 17, 2009), perm. app. denied (Tenn. Nov. 23, 2009). And while a defendant's mental state is rarely subject to proof by direct evidence, Inlow, 52 S.W.3d at 105, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' "from surrounding facts and circumstances." State v. Lowery, 667 S.W.2d 52, 57 (Tenn. 1984); see also Inlow, at 105 ("Intent . . . may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence."); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993) ("'One's actions are circumstantial evidence of his intent.'" (quoting State v. Barker, 642 S.W.2d 735, 737 (Tenn. Crim. App. 1982))).

Cases from other jurisdictions applying statutory law similar to ours have held that evidence establishing the severe nature of the injuries suffered by the victim in a shaken baby syndrome case can support a rational inference that the defendant "knowingly" harmed the victim. In State v. Broseman, 947 S.W.2d 520 (Mo. Ct. App. 1997), a jury found a father guilty of the second degree murder of his four-month-old son. Missouri statutory law provided that a person commits second degree murder if he or she "[k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person," and that "[a] person acts 'knowingly' with respect to the result of his conduct when he is aware that his conduct is practically certain to cause that result." Id. at 523-24 (quoting Mo. Rev. Stat. §§ 565.021.1(1) and 562.016.3(2)

11

(1994), respectively). The defendant argued that there was insufficient evidence to show that he intended to cause the victim's death. Based on medical testimony in the case that the shaking would have been "very violent[]" the appellate court concluded that "the serious nature of [the baby's] injury is, in and of itself, a basis for inferring that [the defendant] knew that his actions would be practically certain to result in [the baby's] death." Id. at 524.

In State v. Gulertekin, No. 97APA12-1607, 1998 WL 831463 (Ohio Ct. App. Dec. 3, 1998), a child caretaker was convicted of the felonious assault of a baby where that offense was statutorily defined as "knowingly . . . caus[ing] serious physical harm to another," and statutory law further provided that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. . . ." Id. at *20 (quoting Ohio Rev. Code Ann. §§ 2903.11 and 2901.22(B), respectively). Two doctors attested that severe force would have been necessary to cause the victim's injuries, which included a skull fracture as well as other injuries consistent with shaken baby syndrome, and the court of appeals concluded that, based upon this testimony, a rational trier of fact could find that the defendant in that case acted knowingly. See also State v. Brunell, 615 A.2d 127, 131 (Vt. 1992) (noting that inference of intent to kill may properly be drawn where a child is attacked solely with the hands) (citing 2 Wayne R. LaFave, et al., Substantive Criminal Law § 7.2, at 195 (1986)).

Our Court of Criminal Appeals indicated that there was inadequate evidence to support a second degree murder conviction in the case before us because there was no proof that the defendant acted knowingly in causing Ashley's death, stating "the defendant's theory of the case was that he did nothing to harm the victim and that she was injured when she fell down a flight of stairs." However, as we have noted, the evidence, not the theories of the parties, is determinative of whether jury instruction is required with respect to a particular offense. Allen, 69 S.W.3d at 187-88.

Upon review of the record as a whole, we find evidence from which the jury could have reasonably inferred that the defendant was aware that his conduct was reasonably certain to cause Ashley's death and, therefore, that he knowingly killed her. First, it was undisputed that Ashley was in the sole care of the defendant when she suffered her fatal injuries. There was medical testimony from which it could reasonably be concluded that she died as a result of being shaken; therefore, the jury could reasonably infer that the defendant caused Ashley to die by shaking her. Furthermore, as we have noted, Dr. Schmidt attested that "extreme, severe, out of control" shaking would have been required in order to generate sufficient force to produce the neurological injury that Ashley suffered. Similarly, Dr. Gunther testified that to produce shaken baby syndrome in a child of Ashley's age "you would have to shake [the child] extremely hard," that "you must shake the baby so hard that the baby's head whips back and forth and the axons of the neurons break." Based upon this

12

medical testimony regarding the extreme amount of force used to cause Ashley's injuries, we believe a jury could also infer that the defendant was aware that his conduct was reasonably certain to cause Ashley's death and, therefore, that he knowingly killed her. Because we conclude that there was sufficient evidence in this case from which a jury could reasonably determine that the elements of second degree murder were established, we further hold that the trial court erred in failing to instruct the jury as to that offense.

It necessarily follows, then, that the trial court also erred in failing to instruct the jury as to the two remaining included offenses of reckless homicide, which is defined as "reckless killing of another," Tenn. Code Ann. § 39-13-215 (Supp. 1996), requiring that a person "is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur," Tenn. Code Ann. § 39-11-302(c), and criminally negligent homicide, which is "[c]riminally negligent conduct which results in death," Tenn. Code Ann. § 39-13-212 (1991), requiring that a person "ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur," Tenn. Code Ann. § 39-11-302 (d). The mens rea of recklessness and criminal negligence are encompassed by the definition of "knowing," Ely, 48 S.W.3d at 723 (citing Tenn. Code Ann. § 39-11-301(a)(2)), and therefore, having concluded that the evidence would have supported a reasonable inference that the defendant knowingly killed Ashley, we must necessarily conclude that the evidence would have supported a reasonable inference that the defendant acted either recklessly or with criminal negligence.

Having determined that the trial court should have instructed the jury as to the lesser-included offenses of second degree murder, reckless homicide, and criminally negligent homicide, we must now determine whether the trial court's failure to instruct the jury as to those offenses was harmless error.

We have recognized three categories of error: 1) structural constitutional errors, which compromise the integrity of the judicial process and require automatic reversal; 2) non-structural constitutional errors, which require reversal unless the State proves beyond a reasonable doubt that the error is harmless; and 3) non-constitutional errors, which do not require reversal absent proof by the defendant that the error more probably than not affected the judgment or would result in prejudice to the judicial process. State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). The failure of a trial court to instruct the jury as to a lesser-included offense is a non-structural constitutional error, id. at 371 n.16 (citing State v. Page, 184 S.W.3d 223, 230 (Tenn. 2006)), and accordingly, the State has the burden of showing that the error is harmless beyond a reasonable doubt. As we noted in Rodriguez, whether error is harmless is not determined by the existence of sufficient evidence to affirm a conviction or by the belief that the jury rendered the correct verdict. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's

13

decision-making. . . ." Rodriguez, 254 S.W.3d at 372 (citations omitted); see also Allen, 69 S.W.3d 181, 190 (Tenn. 2002) (noting that proper test in harmless error analysis of non-structural constitutional error is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (quoting Neder v. United States, 527 U.S. 1, at 15 (1999))). In assessing whether an error did not affect the trial's outcome beyond a reasonable doubt, we must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Allen, 69 S.W.3d at 191.

In the instant case, the jury convicted the defendant of aggravated child abuse and felony murder in the perpetration of aggravated child abuse, which required, at least, a finding that the defendant "knowingly, other than by accidental means, treat[ed] a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code. Ann. § 39-15-401(a). However, as we stated in Burns, "[w]hether sufficient evidence supports a conviction of the charged offense does not affect the trial court's duty to instruct on the lesser offense if evidence also supports a finding of guilt on the lesser offense." 6 S.W.3d at 472; see also State v. Monger, No. W2000-00489-CCA-R3-CD, 2001 WL 1011763, at *15 (Tenn. Crim. App. Aug. 27, 2001), perm. app. granted, cause remanded (Feb. 11, 2002) (noting that the absence of intent to commit aggravated child abuse is not an essential element of the lesser-included offenses of felony murder, and establishment of that intent is immaterial in determining whether there is sufficient evidence for conviction of such lesser-included offenses). Thus, a finding by the jury that the evidence established the elements of aggravated child abuse would not preclude the jury from convicting the defendant of the lesser-included offenses of felony murder. Had it been properly instructed as to the lesser-included offenses, based upon the evidence presented, the jury could have alternatively found that the defendant was aware that his actions were reasonably certain to cause Ashley's death, supporting a conviction of second degree murder; that he was aware of, but consciously disregarded, a substantial risk that Ashley's death would occur, supporting a conviction of reckless homicide; or that he ought to have been aware of a substantial and unjustifiable risk that her death would occur, supporting a conviction of criminally negligent homicide. As we stated in Ely,

> [when] the evidence clearly was sufficient to support a conviction for second degree murder, reckless homicide, or criminally negligent homicide, [and] the jury was not given an opportunity to reach a decision on these offenses[,] . . . we cannot say that the failure to instruct on the lesser-included offenses was harmless beyond a reasonable doubt.

48 S.W.3d at 727; see also Locke, 90 S.W.3d at 673.

14

In summary, we hold that the trial court erred in failing to instruct the jury as to the lesser-included offenses of second degree murder, reckless homicide, and criminally negligent homicide and that it has not been established that such error was harmless beyond a reasonable doubt. Thus, the trial court's error in this regard warrants reversal of the defendant's conviction for felony murder by perpetration of aggravated child abuse and a new trial on that issue.

## Conclusion

For the reasons stated, it is our conclusion that the trial court erred by failing to instruct the jury on second degree murder, reckless homicide, and criminally negligent homicide as lesser-included offenses of felony murder. We further conclude that it has not been shown that such error was harmless beyond a reasonable doubt. Accordingly, the defendant's conviction for felony murder is reversed, and the judgment of the Court of Criminal Appeals is reversed. This case is remanded to the trial court for a new trial consistent with this opinion. Costs of the appeal are taxed to the State.

_____
SHARON G. LEE, JUSTICE