# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 9, 2012

## STATE OF TENNESSEE v. BOBBY L. LOOPER

**Appeal from the Circuit Court of Van Buren County**
**No. 2215-F    Larry B. Stanley, Jr., Judge**

---

### No. M2011-01642-CCA-R3-CD - Filed August 15, 2012

A jury convicted Bobby L. Looper ("the Defendant") of one count of second degree murder, and the trial court subsequently sentenced him as a Range I offender to twenty years in the Tennessee Department of Correction. In this appeal as of right, the Defendant challenges the sufficiency of the evidence supporting his conviction and the length of his sentence. Upon our thorough review of the record and relevant authorities, we affirm the Defendant's conviction and the length of his sentence. This matter is remanded to the trial court for the entry of a corrected judgment order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Dan T. Bryant, District Public Defender; L. Scott Grissom, Assistant Public Defender, McMinnville, Tennessee (on appeal); Howard Upchurch, Pikeville, Tennessee, and Tommy Austin, Dunlap, Tennessee (at trial), for the appellant, Bobby L. Looper.

Robert E. Cooper, Jr., Attorney General & Reporter; Rachel Harmon, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Randall Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged with one count of second degree murder, resulting from the shooting death of the victim, Michael L. Hensley, on December 3, 2009. At the Defendant's jury trial, conducted in early 2011, the following proof was adduced:

Belinda London testified that she worked at the Bledsoe County 911 Center and that she received a call at 9:33 p.m. on December 3, 2009, from 4571 Longwood Mooneyham

Road.  The caller identified himself as the Defendant.  The call was recorded and played for the jury.  The recording also was admitted into evidence.  The recording provides as follows:

911:        Bledsoe County 911, can I help you?

CALLER:     Yes ma'am, uh, I just tried to kill; I just did kill a man that tried to kill me in my own home.

911:        You just killed a man?

CALLER:     Yes ma'am and he tried to kill me in my own home.

911:        Where are you at?

CALLER:     Uh, 4571 Mooneyham Longwood Road.

911:        Mooneyham Longwood?

CALLER:     Yes ma'am.

911:        Road; 4571 Mooneyham Longwood Road.

CALLER:     Yes ma'am.

911:        And he tried to kill you?

CALLER:     Yes ma'am and I just killed him.

911:        What did you kill him with?

CALLER:     Uh, a 410 shotgun.

911:        Who was it?

CALLER:     I don't know him; I, I never seen him before in my life.

911:        Did he try to break in or something on you?

CALLER:     Yes ma'am -- he broke into my house.

911:        Okay, what is your name?
CALLER:     Bobby Lane Looper.

911:         Okay, uh, you are in Van Buren County, right?

CALLER:   Yes ma'am.

911:         Okay, I am going to transfer you to Van Buren, okay, and then
            they can get somebody up there, okay?

CALLER:   Yes ma'am.

911:         Just stay on the line.

CALLER:   Yes ma'am.

On cross-examination, London stated that she did not know the Defendant and previously had not received a call from him. She acknowledged that the voice she heard was "slurred" and that the caller was talking in a "slow fashion."

Deputy Christopher Russell of the Van Buren County Sheriff's Department testified that he was on duty that night with Deputy Aaron Turpin. At about 9:30 p.m., he was dispatched to the Defendant's residence to investigate an alleged break-in and shooting. He left from the jail where he had received the call, and Deputy Turpin followed him in a second vehicle. Deputy Russell stated that it took ten to fifteen minutes to drive to the Defendant's residence. On the way, he requested an ambulance. When he arrived at the Defendant's house, he mounted the porch and approached the sliding glass doors. There were some lights on inside, and he looked through the doors. On a counter near the door, he saw a small bore gun. He knocked on the door, but no one answered. He knocked louder, and the Defendant walked out of the hallway and answered the door. Deputy Russell identified himself and told the Defendant that he had received a call about a shooting. The Defendant told him that there was "nothing going on there." When Deputy Russell looked down, however, he saw what appeared to be blood on one of the Defendant's shoes and on his pants. Deputy Russell inquired about the blood, and the Defendant responded that there was no blood on his pants. Deputy Russell again inquired if anyone had been shot, and the Defendant stated that no one had been shot. Deputy Russell then asked if anyone else was there, and the Defendant stated that there was not. Deputy Russell asked permission to look for himself, which the Defendant granted.

Deputy Russell asked the Defendant to step outside and wait with Deputy Turpin while Deputy Russell looked around. After Deputy Russell entered the house, he found the victim in the interior hallway of the house. The victim was lying face down in what appeared to be a large pool of blood. Deputy Russell checked for a pulse and breathing but discerned neither. Deputy Russell returned to the Defendant and Deputy Turpin and took the Defendant into custody. Deputy Russell then called for further assistance.

After additional help arrived, Deputy Russell and Deputy Turpin circled the outside of the house but found no evidence that anyone had broken in. They remained on the scene to keep it secure. Deputy Russell also checked periodically on the Defendant.

On cross-examination, Deputy Russell acknowledged that he no longer worked for the sheriff's department. He also acknowledged having prepared a written report about the incident on December 5, 2009. The report indicated that it took him seventeen minutes to arrive at the Defendant's residence after he got the call from dispatch. Once there, he noticed two parked vehicles: a red Mustang and, behind it, a "cream-colored Chevrolet four-wheel drive [pickup]."

Deputy Russell explained that he went in the house the first time to investigate whether anyone else was present; went in the house a second time with ambulance personnel; and went in the house a third time with Chief Deputy Evans after he arrived. No one else entered the residence until after Jason Craighead and Tennessee Bureau of Investigation ("TBI") Agent Kendall Barham arrived. Deputy Russell did not touch the gun that was lying on the counter but stated that it looked like it had been sawed off. Deputy Russell described the lighting in the house as "dim" and stated that the ceiling light in the hallway was off. The hallway was lit by a night-light. Additionally, the lights in the adjacent bathroom and bedroom were also on.

Deputy Russell testified that, in speaking with the Defendant, he had not smelled alcohol on him. Nor did he notice the Defendant's speech to be slurred. After placing the Defendant in handcuffs, Deputy Russell placed the Defendant in the back of a patrol car. Deputy Russell recalled seeing an abrasion on the Defendant's face.

On redirect examination, Deputy Russell stated that he remembered seeing the Defendant wearing his glasses at some point that night.

Twana Bricker testified that she is employed by the Van Buren County EMS as paramedic, director, and coroner. She responded to the Defendant's residence and determined that the victim had no pulse. She declared the victim deceased at 10:17 p.m. She also took some photographs of the body in her capacity as coroner. She noticed bloody footprints near the body. She was careful not to disturb the scene during her time in the house.

Robert Dodson testified that the victim, Michael Hensley, was his wife's brother and that the Defendant was his wife's cousin. He stated that the victim and the Defendant were cousins and that they were "very close." Dodson lived across the street from the Defendant and saw the victim visiting the Defendant frequently. Dodson had gone hunting with the victim on numerous occasions and knew him to have a Beretta 9 mm. pistol. To his knowledge, the victim did not own a .357 magnum. On the day the victim died, he and

-4-

Dodson had communicated by text several times. The last message he got from the victim was at 8:06 p.m. He responded with a text message at 8:07 but did not get a response.

On cross-examination, Dodson acknowledged that the victim was close to six feet, one inch tall and weighed about 275 pounds. At the time of his death, the victim was separated from his wife. Dodson recovered the victim's pickup from the Defendant's residence the next morning. Inside was the victim's deer rifle, a 30-06. The gun was not loaded.

On redirect examination, Dodson stated that the victim's pickup also contained the victim's backpack full of hunting items, the victim's hunting coat, and some grocery items.

Special Agent James Howard Patterson of the TBI testified that he worked in the Technical Services Unit and conducted forensic examinations of "digital electronic evidence, computers, [and] cellphones." He examined two cellphones in conjunction with this case. One, a Motorola cellphone, indicated that a text message had been sent to phone number 423-619-5456, identified on the phone as "Cuttie," which stated, "I'm a little drunk right now. Tomorrow would be better. Don't be mad at me. 1378." However, there was not a date associated with this outgoing text message. This same phone also contained a draft text message stating "OK, Baby, right now I'm dealing with Cuz and that is all you need to know. I'm fine and he will be." The number to which this draft message was to be sent was 423-619-5456, but the message was never sent. According to Special Agent Patterson, it was not possible to determine when the text message was drafted. Also reflected on the phone was a text message received from Cuttie on December 3, 2009 at 10:34 p.m. stating "Would you like to watch a movie tonight or tomorrow?" Special Agent Patterson did not know whether the phone was referring to Eastern or Central time.

Gail Hixson testified that she met the Defendant and the victim at about the same time in 2007 at their mutual place of employment. She began dating the Defendant, and they married in December 2008. During the marriage, she and the Defendant and the victim spent time together. Hixson and the Defendant separated in August 2009. She told the Defendant that she wanted a divorce and moved out. Shortly thereafter, her relationship with the victim "intensified." She did not tell the Defendant about this development, and she and the victim took pains to keep it from him. One of the methods they employed to keep their relationship from the Defendant was using text messaging instead of phone calls to communicate.

On December 3, 2009, she called the Defendant to ask him to cancel the cellphone contract they shared so that she could get her own. He told her that he had company and hung up. She and the victim were also text messaging back and forth on December 3, 2009. The victim, however, "wasn't responding like he usually" did. She explained that the victim usually responded immediately, but that he did not that night.

One of the text messages she sent to the victim that night asked, "Would you like to watch a movie together tonight or tomorrow?" His texted response was, "I'm a little drunk right now. Tomorrow would be better. Don't be mad at me." She texted in reply, "I'm not

mad at you. I do hope to see you tomorrow." She sent several additional texts asking the victim questions but received no replies. When asked if she received the text message that was in the Motorola phone's draft storage, she said, "No." She added that the victim referred to the Defendant as "Cuz."

Hixson also explained that the victim had wanted to stop hiding their relationship so that they could spend the holidays together. She, however, was afraid of what the Defendant would do upon learning of their relationship. Hixson stated that she had lived in the Defendant's house with him and knew that he owned guns. She recalled the sawed-off .410 shotgun. She stated that the Defendant kept that gun loaded and that it hung from a hook next to the sliding glass doors. The Defendant also kept another shotgun in the main bedroom. He also had a handgun, which she described as "his favorite." He kept the handgun loaded and "close by."

On cross-examination, Hixson acknowledged that, on December 3, 2009, she and the Defendant were still married. She had filed for divorce in October 2009. The complaint reflected that she was still living with the Defendant on September 25, 2009. She acknowledged that she was having intimate relations with the victim on August 31, 2009, and thereafter. She also acknowledged that the victim was a party in a divorce action filed in November 2009.

Hixson further testified that the Defendant and the victim were cousins and good, close friends. They drank together "[s]ometimes." She denied that the victim told her that he was going over to the Defendant's house on the night of December 3, 2009. She admitted that 423-619-5456 was her cellphone number. She also acknowledged telling investigators that the Defendant's eyesight required correction with either glasses or contact lenses.

On redirect examination, Hixson admitted that the Defendant had asked her out on a date once in November 2009.

Jason Craighead testified that he was an investigator with the prosecutor's office and that he was trained in processing crime scenes. Deputy Russell contacted him after discovering the victim's body, and Craighead contacted the TBI to get an agent en route. Craighead then reported to his office and gathered what he needed to process the crime scene. The first thing he did after arriving at the scene was to collect evidence from the Defendant. He processed the Defendant for gunshot residue and took photographs of the Defendant. These photographs depict some marks on the Defendant's head, areas of redness on his neck, left shoulder, right knee, and lower right back, and a cut on his left hand. Craighead also collected the Defendant's clothing, which he turned over to the TBI. He videotaped the crime scene, and the video-recording was played for the jury. At the scene, he saw a prescription bottle in the Defendant's name labeled Alprazolam .5 milligrams. He found the bottle at the edge of an end table and several pills on the floor nearby. A receipt

for the prescription indicated that it had been filled on December 2, 2009, and that the prescription was for 60 pills.

Craighead also identified a diagram that had been composed of the Defendant's house as consistent with the layout, although the diagram was not drawn to scale. This diagram was admitted into evidence and indicated that, at the end of the hallway, a door opens into a bedroom. Immediately before this doorway, two doors open off of the hallway, one into a bathroom on the left and the other, which is opposite the bathroom door, into a bedroom.

On cross-examination, Craighead explained that he began shooting the video sometime after midnight. He also stated that the Defendant was not wearing glasses when he began taking photographs of him. He agreed that the Defendant's driver's license indicated that there was a restriction for glasses. He acknowledged that he found a .357 magnum on the couch with a pillow over it. He stated that this gun was not loaded. On the other couch he found a "powder and ball type pistol that has to be manually loaded." This second handgun was in a holster. He also saw a vodka bottle in the trash.

Agent Kendall Barham of the TBI testified that he was trained in crime scene investigation and that he assisted in the investigation of this case. He identified the Defendant as the person who was removed from the patrol car after Agent Barham arrived on the scene. He stated that his investigation revealed that the red Mustang vehicle at the scene belonged to the Defendant and that the tan truck belonged to the victim. His review of the crime scene that evening revealed no sign of a break-in.

He observed the victim lying in the hallway and took multiple photographs. The victim's head was toward the entry of the hallway from the living area, and his legs were in the space between the doors to the bathroom and the bedroom directly across from the bathroom. His feet were pointed toward the bedroom into which the hallway opened at its far end. Just inside the doorway of this end bedroom, Agent Barham found (and photographed) two shotgun shells, one live and one spent. These shells were lying near the victim's feet. Agent Barham also observed and photographed spots in the bathroom that appeared to be blood spatter. He further observed and photographed what appeared to be a footprint in the victim's blood that was very close to the victim's head.

Additionally, he found two glasses in the kitchen sink. He gathered up two empty vodka bottles and three orange juice containers. He also collected several guns from the Defendant's house, including the .410 shotgun, as well as the live shotgun shell and the spent shotgun shell located near the victim's feet. He also found a pair of glasses on the bedroom floor that one of the deputies later retrieved and took to the Defendant. He bagged the victim's hands prior to the transport of the body for autopsy. The victim's clothing was transported with the body to the medical examiner's office, and Agent Barham later collected

six unfired .357 rounds from the medical examiner's office that had been recovered from the victim's effects.

On cross-examination, Agent Barham stated that he arrived at the scene just after midnight and did not leave until 11:49 a.m. He recalled seeing the prescription bottle with pills in it. He also recalled some pills on the floor near the bottle. Neither the bottle nor the pills were collected as evidence.

Agent Barham acknowledged that he spoke with the Defendant about fifty minutes after he arrived at the scene. He smelled alcohol on the Defendant and noticed that the Defendant's speech was slurred. Agent Barham advised the Defendant of his rights, and the Defendant executed a written waiver. The Defendant then answered Agent Barham's questions. At this time, the Defendant was not wearing glasses. Agent Barham noticed some abrasions on the Defendant's face. Agent Barham described these abrasions as consistent with someone being in an altercation or falling down.

Special Agent Laura Hodge of the TBI testified as an expert in gunshot residue analysis. She received gunshot residue kits taken from the Defendant and the victim. The kits from both persons were inconclusive.

Special Agent James Russell Davis, II, of the TBI also testified as an expert in gunshot residue analysis. He examined clothing and a pair of shoes collected from the Defendant. His examination of the Defendant's shirt revealed that it "was near a gun when it fired, came in contact with a recently fired gun, and/or recently fired ammunition components." In sum, the shirt contained gunshot residue. Special Agent Davis also found "particles that were consistent with gunshot primer residue" on the Defendant's pants and both of his shoes.

Special Agent Michael Turbeville of the TBI testified as an expert "in the area of blood and serology." He examined clothing recovered from the Defendant and blood taken from the victim to determine if the Defendant's clothing contained the victim's blood. Utilizing DNA analysis, Special Agent Turbeville determined that blood stains on the Defendant's shoes matched the blood standard of the victim. He also found blood on the soles of the Defendant's shoes but did not conduct DNA testing on those bloodstains. Special Agent Turbeville did not find blood on the Defendant's shirt. He, however, did find blood on the Defendant's pants, and that blood matched the victim's blood.

Special Agent Robert Daniel Royce of the TBI testified as an expert in firearms identification. He examined the .410 shotgun recovered from the Defendant's home. It was a single-shot gun that had to be opened at a hinge in order to load it by inserting a shotgun shell. He explained that, once it was loaded, it could be fired by thumbing the hammer back (thereby cocking it) and then pulling the trigger. Special Agent Royce testified that cocking the gun required "a significant amount of pressure." Additionally, he determined that it took

"eight and a half pounds of force placed on the trigger in order to discharge" the gun. Special Agent Royce stated that he "certainly wouldn't call it a light trigger pull." The gun ejected any loaded shell when the action was opened. Special Agent Royce described it as "a very simple ejection mechanism" where "[w]hen you open up the action it automatically ejects in whatever direction it's facing." In his testing, the gun ejected the shells "anywhere from 2 to 5 feet."

Special Agent Royce also examined the fired shotgun shell retrieved from the scene and determined that it had been fired from the .410 shotgun retrieved from the scene. The lead pellets recovered from the victim's body were consistent with the pellets that would be found in the shell fired from the gun.

Dr. John Brentley Davis, assistant medical examiner for the State of Tennessee, performed an autopsy on the victim. The victim measured six feet, one inch tall and weighed 278 pounds. During the autopsy, Dr. Davis discovered that the victim's bladder was empty. The cause of death was a shotgun wound to the chest. The victim had a .103 blood alcohol content. Dr. Davis also discovered that the victim had acute hepatitis, i.e., inflammation of the liver. Testing for drugs of abuse was negative. According to Dr. Davis, the barrel of the shotgun was within two feet of the victim when it was fired. The predominant travel path of the pellets recovered from the victim's body was front to back, with "not a lot of deviations to left or right or up or down." Dr. Davis testified that the shotgun wound destroyed the bottom half of the victim's heart. Accordingly, the victim had ten to twenty seconds of consciousness after being shot.

After presenting Dr. Davis, the State rested its case. The defense put on no proof. The trial court instructed the jury on the defenses of ignorance or mistake of fact; intoxication; duress; necessity; self-defense; and protection of property. After deliberating, the jury returned a verdict of guilty as to the indicted offense of second degree murder.

At the sentencing hearing, Vicky Rowland of the Board of Probation and Parole testified that the Defendant had two prior convictions for DUI and also had been charged with driving on a revoked license. These offenses occurred in the late 1990s. The Defendant was on probation at the time he committed the second DUI offense. Rowland prepared a presentence report which was admitted into evidence at the hearing, but which is not included in the record on appeal.

McKayla Hensley, the victim's daughter, testified that the Defendant "ruined [her] life" by killing her father. She also stated that she thought the Defendant deserved "the maximum time."

Tammy Potter and Christy Dodson, the victim's sisters, and several other of the victim's family members also testified to the effect of the victim's death on his family.

Several of these witnesses requested that the Defendant receive the maximum sentence available.

Jamie Walling testified that he was a deputy sheriff at the jail where the Defendant was housed. He stated that the Defendant had caused no problems at the jail. He also stated that, prior to trial, he overheard a phone conversation between the Defendant and his mother during which the Defendant stated that he did not remember what happened during the offense.

After hearing argument from counsel as to both mitigating and enhancement factors, the trial court sentenced the Defendant as a Range I offender to the midrange sentence of twenty years in the Tennessee Department of Correction. In doing so, the trial court relied on two enhancement factors: the Defendant's previous criminal history and the Defendant's use of a firearm during the offense. The trial court subsequently denied the Defendant's motion for new trial.

In this appeal as of right, the Defendant challenges the sufficiency of the evidence underlying his conviction and also challenges the length of his sentence.

**Analysis**

*Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the

defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Second Degree Murder

Our criminal code defines second degree murder as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). Our supreme court has determined that second degree murder is a "result of conduct" offense. See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010). Accordingly, the "knowing" element is satisfied when the proof demonstrates that the defendant was aware this his or her conduct vis-a-vis the victim was reasonably certain to cause the victim's death. See Tenn. Code Ann. § 39-11-302(b) (2006); Brown, 311 S.W.3d at 431-32. "To sustain a finding that a defendant acted knowingly, the State is not required to prove that the defendant wished to cause his victim's death but only that the defendant knew that his or her actions were reasonably certain to cause the victim's death." Brown, 311 S.W.3d at 432. Moreover,

> Whether a defendant acted "knowingly" in killing another is a question of fact to be addressed by the jury. And while a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted "knowingly," from surrounding facts and circumstances.

Id. (citations and internal quotation marks omitted).

The Defendant argues that the proof at trial was not sufficient to support the jury's determination that he shot and killed the victim "knowingly." We disagree. Assessing the proof in the light most favorable to the State, which we are required to do, the jury had before it sufficient evidence from which to conclude that the victim and the Defendant discussed the victim's affair with the Defendant's estranged wife; that the victim and the Defendant had this discussion over alcoholic beverages; that an altercation ensued; that the victim walked down the Defendant's hall to the bathroom in order to urinate; that the Defendant retrieved his .410 shotgun, which he kept loaded; that the Defendant positioned himself near the bathroom door; that the Defendant opened the gun, thereby ejecting a live shell, and reloaded it with another live shell; and that, when the victim exited the Defendant's bathroom after emptying his bladder, the Defendant aimed his shotgun at the victim from only a few feet away, cocked the gun, and pulled the trigger, shooting the victim once in the chest and killing him. This conduct satisfies the definition of "knowingly."

In addressing a similar challenge to a second degree murder conviction, this Court framed the question as "whether the defendant was aware that his conduct was reasonably certain to cause the result." State v. Randy Clayton Norman, No. M2009-01246-CCA-R3-CD, 2010 WL 3448108, at *15 (Tenn. Crim. App. Sept. 2, 2010), perm. app. denied (Tenn. Dec. 8, 2010); see also State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002) ("[f]or

-11-

second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death."). In Norman, the defendant had struck the victim once in the head with an axe. As in the instant case, the proof demonstrated that the victim and the defendant had been drinking. There was also proof that the defendant and the victim had taken prescription pain medication. The defendant claimed that he struck the victim because he was afraid the victim was going to kill the defendant's girlfriend. Nevertheless, the jury convicted the defendant of second degree murder. This Court affirmed on the basis that,

> [i]n the light most favorable to the State, having heard that the defendant consciously chose to use a 'weapon' to respond to what he perceived to be a deadly threat, the jury could reasonably conclude that the defendant was aware that striking the victim in the head with an axe was reasonably certain to cause the victim's death.

Randy Clayton Norman, 2010 WL 3448108, at *15.

Likewise, the proof in this case portends the same result. The proof demonstrated that the Defendant armed himself with the .410 shotgun and then shot the victim in the chest from close range. The jury was entitled to conclude that the Defendant was aware that firing a deadly weapon at the victim from close range was reasonably certain to cause the victim's death. Accordingly, the proof is sufficient to support the Defendant's conviction of second degree murder. The Defendant is not entitled to relief on this basis.

*Sentencing*

We turn now to the Defendant's contention that his sentence is excessive. In making its sentencing determination, a trial court must consider:

> (1) The evidence, if any, received at the trial and the sentencing hearing;

> (2) The presentence report;

> (3) The principles of sentencing and arguments as to sentencing alternatives;

> (4) The nature and characteristics of the criminal conduct involved;

> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010). The trial judge also should consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5) (2010).

When the record affirmatively shows that the trial court considered the statutory sentencing principles and all relevant facts and circumstances, our review is de novo with a presumption that the trial court's determinations are correct. See Tenn. Code Ann. § 40-35-401(d) (2010); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Also, when the trial court considered all of the criteria set out in Tennessee Code Annotated section 40-35-210(b), imposed a sentence within the applicable range, set forth its reasons for imposing the particular sentence, and the record establishes that the trial court's findings of fact are adequately supported, we may not disturb the sentence even if we would have preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). When the record does not demonstrate that the trial court gave due consideration to the requisite criteria, our review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169. The appealing party, here the Defendant, bears the burden of establishing that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts; see also Ashby, 823 S.W.2d at 169.

The Defendant was convicted of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210(c). The Range I sentence for a Class A felony is fifteen to twenty-five years. See id. § 40-35-112(a)(1) (2006). The trial court sentenced the Defendant to the mid-range sentence of twenty years on the basis of two enhancement factors: the Defendant's prior criminal history, see id. § 40-35-114(1) (Supp. 2009), and the Defendant's use of a firearm to commit the murder, see id. at (9). The Defendant argues that the trial court assigned too much weight to the first of these factors because the Defendant's prior criminal history consists of misdemeanors that occurred more than ten years previously. As to the second factor, he argues that "realistically most killings in Tennessee are done with a firearm and to allow this factor to increase the sentence by five (5) years serves no legitimate purpose." The Defendant has cited to no authority for either of these propositions. Therefore, the Defendant's claims are waived. See Tenn. Ct. Crim. App. R. 10(b).

Moreover, our supreme court has made clear that this Court may not reduce a defendant's sentence simply on the basis of the trial court's weighing of the various applicable mitigating and enhancement factors. See Carter, 254 S.W.3d at 345-46; see also State v. Devin Banks, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007) (recognizing that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts"). The record in this case demonstrates that the trial court considered the appropriate

information in imposing the Defendant's sentence. We note that the trial court specifically rejected the State's request that the Defendant's sentence be enhanced on the basis that the Defendant's conduct demonstrated that he had "no hesitation about committing a crime when the risk to human life was high." See Tenn. Code Ann. § 40-35-114(10). The trial court properly recognized that this enhancement factor is an essential element of the offense of second degree murder and therefore inapplicable as an enhancement factor. See id. § 40-35-114; State v. James Henry Davis, No. M1999-02467-CCA-R3-CD, 2000 WL 1130139, at *3 (Tenn. Crim. App. Aug. 2, 2000). The trial court also rejected the pleas from the victim's family that the Defendant be sentenced to the maximum term possible.

In sum, the trial court imposed a sentence that is consistent with the purposes and considerations of sentencing. Accordingly, we may not disturb it. The Defendant has failed to demonstrate that he is entitled to relief on this basis.[1]

We note, however, that the judgment order erroneously reflected that the Defendant is a "Standard 30%" offender. Pursuant to the Sentencing Act, the Defendant is a "Violent 100%" offender and is not eligible for parole after serving only thirty percent of his sentence. See Tenn. Code Ann. § 40-35-501(i)(1), (i)(2)(B) (Supp. 2009). Therefore, we remand this matter to the trial court for the entry of a corrected judgment order.

## Conclusion

For the foregoing reasons, we affirm the Defendant's conviction and his sentence of twenty years.

_____
JEFFREY S. BIVINS, JUDGE

---

[1] As noted previously, the Defendant failed to include the presentence report in the record on appeal. As the Defendant is challenging only the trial court's weighing of the enhancement factors, and not the sufficiency of the evidence underlying them, this omission has not impeded our review.