# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 1, 2009 Session

## MONTEA WILSON (A.K.A. MARCUS FLOYD) v. STATE OF TENNESSEE

### Direct Appeal from the Criminal Court for Shelby County
### No. P-27290    James C. Beasley, Jr.,  Judge

---

### No. W2008-02439-CCA-R3-PC  - Filed September 30, 2010

---

The petitioner, Montea Wilson, appeals from the Criminal Court of Shelby County's denial in part of his petition for post-conviction relief and simultaneous order of a delayed appeal. After a hearing, the post-conviction court determined that appellate counsel was ineffective in failing to "protect[] the petitioner's right to litigate the trial court's failure to properly instruct the jury on [second degree murder as a lesser included offense of felony murder] by raising that point in the motion for new trial" and granted a delayed appeal.  The post-conviction court further determined that trial counsel were effective in their representation of petitioner and, at the time of the petitioner's trial, had no obligation to request second degree murder as a lesser included offense to felony murder.  In this appeal, the Petitioner argues that the post-conviction court erred by not setting aside his conviction for felony murder and granting a new trial because (1) trial counsel was ineffective for failing to request an instruction on second degree murder and for failing to allege in the motion for new trial that the trial court erred by not instructing the jury on second degree murder as a lesser included offense; and (2) appellate counsel was ineffective for failing to argue on direct appeal that the trial court's failure to instruct the jury on second degree murder as a lesser included offense constituted plain error.  For the reasons set forth within this opinion, we reverse the post-conviction court's determination that trial counsel provided effective assistance of counsel, vacate the petitioner's conviction, and remand for a new trial.   In regard to the petitioner's delayed appeal, our decision pertaining to trial counsel's performance renders it moot.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court
### Reversed and Remanded

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Lance Chism, Memphis, Tennessee, for the Petitioner-Appellant, Montea Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy Carnesale, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In 2000, the petitioner was convicted by a jury of felony murder and attempted especially aggravated robbery.[1] The trial court merged the attempted especially aggravated robbery conviction into the felony murder conviction and imposed a sentence of life imprisonment without the possibility of parole. On direct appeal, this court affirmed the conviction. See State v. Montea Wilson, No. W2000-00748-CCA-R3-CD, 2002 WL 925255, at *1 (Tenn. Crim. App., at Jackson, May 3, 2002).

Although lengthy, the facts of the underlying convictions, as outlined by this court in the petitioner's direct appeal, are significant to our disposition:

> On December 2, 1997, there was an attempted armed robbery at Ace Check Cashing on Getwell Road in Memphis. At trial, the state submitted the prior sworn testimony of Janice Hogue, the Ace Cash Express Director of Security and Facility Management, who was employed in the corporate office. Ms. Hogue's testimony established that Ace Cash Express, a nationwide business with branches providing check cashing and money order services, generally used armored cars to deliver cash to each branch. The policy was to permit each branch to maintain a maximum level of cash on the premises and, when that level was reached, employees were required to request special armored car pick-up services. At the end of each work day, any cash on hand was to be placed in a safe and the alarm activated. There were no security cameras. Ms. Hogue's testimony was that the victim, Cecil Wayne Goldman, who managed the branch located on Getwell Road, set the alarm system at 6:47 p.m. and had 90 seconds to exit the building. The branch had approximately $27,000 in cash at closing, an unusually large amount.

> Shirley Smith testified that on the evening of the offenses, she was entering the Wendy's restaurant on Getwell when she heard several individuals arguing loudly at Ace Check Cashing next door. She saw two young black men with the victim in front of the business and overheard one of the black men say, "You dumb ass. . . ." There were three gunshots and the victim fell

---

[1] The record does not include a copy of the judgment forms. This information was deduced from the petitioner's prior appeals before this court.

to the ground. The black men left the scene on foot, crossing through the Wendy's parking lot towards the Greenwich Square apartments. The victim, who was carrying papers and office supplies in a cardboard box, had been shot and was bleeding. Ms. Smith recalled the gunman was wearing a dark blue jacket.

Dr. Thomas Deering performed an autopsy on the victim. He testified that the victim died of multiple gunshot wounds. A shot to the abdomen, which struck the victim's aorta, would have been fatal and, according to Dr. Deering, caused a loss of consciousness within four to five minutes. Although Dr. Deering could not determine the number of bullets that may have been involved in the shooting, he found four entrance wounds and four exit wounds.

Officer Cham Payne of the Memphis Police Department Crime Scene Unit processed the scene. He testified that he and other unit officers found a set of keys, blood on the surrounding concrete, three .380 bullet casings, and one spent bullet. Officer Payne estimated that the Wendy's restaurant, where Ms. Smith witnessed the attack, was 100 yards from the scene. He testified that the shell casings were not checked for fingerprints, explaining that semi-automatic weapons slide the bullets into the magazine, typically destroying any fingerprints. The officer stated that the heat generated by the firing of a weapon also obliterates fingerprints.

Three days after the shooting, Officer Mark Rewalt, also of the Memphis Police Department Crime Scene Unit, he [sic] recovered an unloaded .380 semi-automatic pistol from a trash can at a bus stop in front of Clark Towers on Poplar Street. The gun had been placed in a bag.

Quiana Payne, who lived in the Greenwich Square apartments and considered the defendant to be her boyfriend, testified that on the evening of the murder, she contacted the defendant on his cellular telephone. He responded that he was "taking care of business" and would call back, then immediately hung up. Three days later, Ms. Payne saw the defendant at the residence of Anita Hunter, where he lived. She recalled that the defendant packed clothes and a black-handled .380 semi-automatic pistol into a gym bag. Later, when she learned of the defendant's involvement in the victim's murder, she returned the bag to Ms. Hunter's residence. Ms. Payne also identified the .380 pistol recovered by Officer Rewalt as that of the defendant. She stated that the defendant was driving a burgundy Mazda 929.

During cross-examination by the defense, Ms. Payne acknowledged that she met the defendant through her past employment as an entertainer at the Pure Passion club. She testified that she learned after the murder that the defendant was dating three other women at the same time he dated her. Ms. Payne stated that she had called the defendant at exactly 6:53 p.m. on the date of the shooting, maintaining that she recalled the time because it was so unusual for him to hang up on her.

Officer Bryant G. Jennings, a member of the Memphis Police Department Crime Scene Unit, executed a search warrant at the apartment shared by Anita Hunter and the defendant. He stated that officers seized a small safe, a small piece of black cloth with cut-out holes, and a pair of black gloves.

Don Carman, a specialist in forensic firearms identification with the TBI Crime Laboratory, examined a black-handled pistol found by officers in a gym bag in the defendant's apartment. He described the weapon as a .380 semi-automatic manufactured by Davis Industries. The magazine held five bullets. Agent Carman stated that unless the gun jammed, it would eject shell casings when fired. He was unable to connect any of the shell casings found at the scene to the black-handled Davis .380. Agent Carman, who also examined the Morrison .380 semi-automatic recovered from the bus station trash can, testified that while shell casings ejected by the gun had similar markings to those recovered at the scene, the quality of the markings was insufficient for him to reach any definite conclusions. He affirmatively concluded that the Morrison .380 had fired the spent bullet found at the murder scene.

Darius Bowles, indicted for the same offenses as the defendant, testified that he first met the defendant, whom he also knew as "LA," in December of 1997 through his cousin, Javon Webster. He stated that on the day of the murder, the defendant, accompanied by Webster and Vincent Broddy, picked him up in a maroon Honda and drove around for approximately two hours before arriving at the defendant's apartment in Greenwich Square at approximately 6:00 p.m. He testified that the defendant, who claimed to be a member of the International Black Mafia, planned the robbery of the Ace Check Cashing, arranged everyone's participation, and discussed a four-way split of the proceeds. Bowles stated that the defendant provided him and Webster with weapons, instructing him to be a "look-out" for Webster, who was to apprehend the victim. He claimed that the defendant developed a plan whereby Webster was to confront the victim outside, return him to the store,

and force the surrender of the cash. Bowles recalled that the defendant believed they could recover $50,000 to $75,000 in cash. He identified the Morrison .380 recovered from the trash can by Officer Rewalt as the one given to Webster and the black-handled .380 as the gun he was provided.

Javon Webster was convicted of felony murder and attempted especially aggravated robbery as a result of these offenses. This court affirmed his convictions on February 7, 2002. See State v. Javon Webster, No. W2000-01912-CCA-R3-CD (Tenn. Crim. App., at Jackson, Feb. 7, 2002).

According to Bowles, the men positioned themselves outside of the store at 6:30 p.m. to wait on its closing. He testified that he and Webster were stationed in bushes outside of Ace Check Cashing with Jasper Temple, who lived in the Greenwich Square apartment complex and who had agreed to participate in the robbery. Temple used a walkie-talkie to communicate with the defendant and Broddy, who were located across the street. Bowles testified that he was wearing a blue Adidas sweatshirt, gray jogging pants, and black and white Air Jordan tennis shoes. The other members of the group were generally wearing dark clothing. Bowles recalled that when the defendant provided the code word "A-okay" over the walkie-talkie, Webster ran to the door of Ace Check Cashing. Bowles, who followed Webster, contended that the victim "started hollering," panicked, and threw a box at Webster. Webster wrestled briefly with the victim and, as Temple yelled, "Shoot him," shot three to four times. Bowles testified that after the shooting, he ran through a field and the Wendy's restaurant parking lot to the Greenwich Square apartments. Afterward, the five men met at a green generator in the complex, where he and Webster returned their guns to the defendant. Bowles contended that he asked Webster why he shot the victim and Webster was unable to explain. He estimated that the men waited for approximately 30 minutes before the defendant drove them home. The defendant said, "Just be cool," and informed him that he would telephone the next day. Bowles was arrested three days later and showed police where to find the defendant. While acknowledging that he had belonged to a gang, Bowles contended that he committed the crimes for money and that they were not gang-related.

During cross-examination, Bowles maintained that he had joined the Crips gang in early 1997 and quit midway through the year. He denied that he had ever achieved a rank in the gang or "thrown" gang signs. Bowles agreed, however, that Webster, Broddy, and Temple were Crips. He admitted telling police that his cousin, Webster, had stated that he intended to rob Ace Check Cashing and invited him along. He also acknowledged that he initially lied to

police by telling them that he did not know his cousin's last name. Bowles agreed that he did not mention Broddy in his first statement to police, but denied that he had protected him out of gang allegiance. He testified that the defendant, at the time of the offenses, was dressed in jeans, a silver coat, and tennis shoes.

Robert White, a patrol officer with the Memphis Police Department, testified that he, Officer Sammie Ballard, and others arrested the defendant at his girlfriend's apartment in Greenwich Square. He testified that the defendant was not there when they arrived, but later drove into the parking lot. Officer White stated that when police approached, the defendant fled on foot. He was finally apprehended on a stairway landing.

Captain John A. Wilburn, who was a sergeant in the Memphis Police Department homicide division at the time of the murder, testified that he took a recorded statement from the defendant on December 11. When he learned that the defendant wanted to talk, he checked him out of jail and transported him to the homicide offices. After being advised of and waiving his Miranda rights, the defendant gave the following statement:

> After I got back from Mississippi, me and [Broddy] drove into Greenwich Square apartments and I run into [Webster] and [Bowles], "[T]ip" and Billy all standing around outside in the back of the cove. We all were sitting out there talking for a second. Webster decided that they wanted to go and rob the check cashing place over there on Getwell. [Webster] asked if anybody had any units (guns). [Broddy] said, "Yeah, I got a .380." I said, "Well, I got a gun too." So, [Webster, Bowles], Billy and Tip decided they would go rob the check cashing place. They asked me if I would watch out for the police. [Bowles] had already had the walkie-talkie's and we were playing with them outside.
>
> [Broddy] gave [Webster] his .380 and I had a .380 that I gave to [Bowles]. Billy went inside his house and put on some black clothes, [Broddy] had already had on some black (clothes), and Billy, [Webster, Bowles], Tip and [Broddy] walked down to the check cashing place. When they walked down there, [Bowles] had a walkie-talkie[;] [Broddy] had a walkie-talkie. [Broddy] and Billy were gon' stand on the opposite side of the street, and Tip and [Webster] and [Bowles] were gon' be in the

bushes, and I was gon' ride up the street and see if I saw any police. If I saw the police, I was instructed to blow the horn.

I rode up Getwell to Amoco gas station, turned around, I came back to the Greenwich Square apartments. Then I rode back up to the Amoco gas station. As I was riding back up to the Amoco gas station, I heard three (3) shots go off. When I looked over toward the check cashing place, I saw [Webster] struggling with the guy that was inside. . . . That's when the guy had a box or something . . . I saw that fly up in the air. That's when I heard the shots. I saw Webster shoot the guy three (3) times. My window was down, I heard the guy hollering for help, and he was screaming.

I drove on down to American Way, made a left and went down to Lamar, came back up to Knight Arnold, made a left and came back around to Getwell. Went back to Greenwich Square apartments. That's when they all came running back over there. That's when [Bowles, Webster, Broddy], Billy and Tip came running back over there to the apartments. They came inside my sister's apartment, and [Webster] said, "Man, I didn't get no money. The guy was grabbing on me." We sat around there and we talked for a couple more minutes. Everybody got scared. I went outside, me and [Broddy] were outside and security guards were telling us that they were looking for some guys dressed in black, for us to go in the house.

Billy went home, Tip went home and I took [Webster] and [Bowles] home. [Webster] took the gun with him, the .380 that he used. The other gun was left there at my sister's apartment. [Bowles] took the walkie-talkie's back to the guy that loaned them to him.

Captain Wilburn executed a search warrant at the defendant's apartment on December 9, one week after the murder. During the search, he and other officers seized a black bag containing a black jumpsuit and a smaller black bag with the black-handled .380 inside.

Memphis Police Department Officer Sammie Ballard, called as a defense witness, testified that on the day following the murder, he and other officers canvassed the scene, including Greenwich Square, looking for

suspects and passing out Crime Stoppers cards. Officer Ballard recalled that two days later, at approximately 9:00 a.m., police received information which lead to the arrest of Webster and Bowles. Another tip led to a handgun in a trash can on Poplar Street. Officer Ballard testified that when the defendant was arrested, he gave them information implicating Webster and Bowles.

Dr. Carl Nelson, who qualified as an expert on gang affiliation, testified that he was employed by the Tennessee Department of Correction at the Memphis Correction Center. He stated that he had interviewed the defendant and that it was his opinion that the defendant was not a gang member. According to Dr. Nelson, there is no gang known as the International Black Mafia. He explained that the Crips originated in Los Angeles in approximately 1969 or 1970 and that the gang had moved eastward to sell illegal drugs. Dr. Nelson described the Crips as having no national structure but being tightly run at the local level, with fellow gang members referring to one another as "cousins." He stated that the Crips made a practice of blaming their crimes on rival gang members or snitches that they were able to befriend. During cross-examination by the state, Dr. Nelson conceded that the defendant had not necessarily been falsely accused because he was implicated by gang members. He also acknowledged that he did not confer with anyone involved in the crime other than the defendant.

Anita Hunter testified that at the time of the offenses, the defendant was living with her in her Greenwich Square apartment. She stated that she and the defendant were "friends" and acknowledged that the defendant had two to three other girlfriends. Ms. Hunter recalled that when she returned home after work at approximately 5:30 p.m. on the day of the murder, the defendant was not there, but that he was acting normally when he returned at 9 or 9:30 p.m. At approximately 10:30 p.m., she left for work and could not remember whether the defendant was at the apartment when she returned the next morning. Upon cross-examination by the state, she confirmed that on the date of the murder, the defendant, pursuant to her request, was in the process of moving out of her apartment.

Denise Wright, who was dating the defendant in December of 1997, testified that at that time, the defendant was living with Anita Hunter, whom she believed to be his sister. She recalled that she visited that apartment on five or ten occasions and would occasionally spend the night. Ms. Wright testified that she had once seen the Morrison .380 police found in the Poplar Street trash can. It was on a night stand in the den at the apartment. The defendant and Broddy were the only others present. Ms. Wright claimed that

on the day of the murder, the defendant was at her apartment from approximately 5:00 or 5:30 p.m. until 9:00 p.m except for a period of ten or 15 minutes at 6:45 p.m. when he left after receiving a cellular telephone call or page. Ms. Wright contended that because employees of the district attorney's office had tried to confuse her during pre-trial questioning, her statement contained error regarding the timing of various events. She maintained that her trial testimony was truthful.

During cross-examination, Ms. Wright acknowledged that she had reviewed her pre-trial statement and had not asked for corrections. She claimed that the black-handled .380 found in the gym bag in the defendant's apartment was hers, as was the car the defendant was driving on the day of the murder. She admitted that in her prior statement, she told authorities that the defendant and Broddy had accompanied her to Mississippi on the day of the murder to pick up her child, leaving at approximately 3:00 p.m. and returning an hour and one-half later. Ms. Wright acknowledged that she told investigators that she had loaned the defendant her car for the remainder of the day and that he brought it back to her at approximately 8:00 p.m. She also acknowledged that she had initially stated that she then drove Broddy and the defendant home, drove back to her apartment briefly, and then returned to the defendant's apartment.

The defendant, who was 28 years old at the time of trial, testified that his real name was Marcus Montea Floyd. He acknowledged that he had been convicted of theft in 1991, robbery twice in 1993, and criminal impersonation in 1997. The defendant stated that in November and December of 1997, he lived with Anita Hunter, with whom he had had a prior sexual relationship. He acknowledged that during that time, he simultaneously dated several women without advising any of them of his multiple relationships. He and Ms. Hunter referred to one another as "brother" and "sister." The defendant testified that at the time of the offenses, he had known Vincent Broddy for approximately one month and the remainder of those involved for a matter of weeks. He maintained that the gun used by Webster belonged to Broddy and that the one used by Bowles belonged to Denise Wright. The defendant stated that on the day of the murder, he awakened at 5:15 or 5:30 a.m. to call in to work because he was not feeling well. He claimed that he then drove Denise Wright to her residence and returned to his apartment to sleep. The defendant testified that at approximately 11:30 a.m., Broddy, Webster, and Bowles arrived at his apartment and asked whether he still had the gun belonging to Ms. Wright. Contending that he was not in a gang and had never heard of the International Black Mafia, he accused Broddy, Webster, Bowles, and Temple of being

-9-

members of the Crips gang. The defendant claimed that he gave the gun to Bowles without asking the three men their intentions and that the men left his apartment at approximately 12:30 p.m. He stated that he remained at his apartment until returning to Ms. Wright's residence at approximately 5:00 p.m. The defendant stated that he stayed at Ms. Wright's for two to three hours before leaving for ten to 15 minutes after receiving multiple pages from Quiana Payne. He explained that he went to a local store to purchase cigarettes and call Ms. Payne and then returned to Ms. Wright's apartment where he watched television for the remainder of the evening.

The defendant testified that during the next two days, he saw police officers canvassing the area, passing out fliers and Crime Stoppers information. He stated that three days after the murder, he called Crime Stoppers and identified Webster and Bowles as the assailants. The defendant contended that he would not have called Crime Stoppers had he committed the crimes. He claimed that after conversing with Officer Ballard several times that day, he acquired the Morrison .380 from Broddy, wrapped it in a plastic bag, and placed it in a garbage can on Poplar for police. The defendant testified that he acknowledged to Officer Ballard that "LA," was his nickname, which stood for "Ladies All the Time." The defendant claimed that he drove to Ms. Hunter's apartment to return her car and was arrested by police. He testified that he gave officers the alias Montea Wilson because he had a prior record in his own name. The defendant contended that the statement that he gave police on December 11 was false because he "wanted to give them everything that they wanted at that particular time." He maintained that they wanted him to place himself at the scene so that he would be a good witness and that he acquiesced in their request. The defendant denied any role in planning the offenses.

During cross-examination, the defendant claimed that he had falsely testified at a suppression hearing that he was at Anita Hunter's apartment at the time of the offenses. He also acknowledged that he had lied during his direct examination by testifying that his two prior robbery convictions were for offenses occurring on the same date. The defendant admitted that his resume indicates that he graduated from Crenshaw Senior High in California when he actually failed to complete high school at Jackson Central Marion in Jackson, Tennessee. He testified that he lied extensively in his first statement, at which time he told police that he was in Mississippi at the time of the crimes and that Webster and Bowles had confessed to the murder while riding around in a car. The defendant contended that he gave a second statement admitting his own involvement only because the police told him that his first statement was "no

-10-

good" because he was not at the scene. He explained that he lied at the suppression hearing only because he was concerned about being charged with perjury and wanted his testimony to be consistent with his second statement.

Lieutenant Raymond H. Hopkins of the Memphis Police Department, who works with Crime Stoppers, testified that Crime Stoppers keeps records of all tips received and forwarded to investigators. Callers are given secret codes to ensure their anonymity, then asked to call back later. Lieutenant Hopkins identified tip number 016542 as having been telephoned in at 9:10 a.m. on December 5, 1997. He stated that the tipster gave the names of two suspects in the Ace American Check Cashing incident, Javon and Pookie, and said that they had committed the crime in order to prove their loyalty to the Crips gang. Lieutenant Hopkins testified that the caller stated he had received his information from the suspects. In response to questioning by the state, he acknowledged that he had no knowledge whatsoever of the identity of the caller.

Montea Wilson, 2002 WL 925255, at *1-7 (footnote omitted).

Following his conviction for felony murder, the petitioner filed a motion for new trial. The record does not include a copy of the motion for new trial or a transcript from the hearing. Based on the trial court's findings, the defense did not assert that an instruction should have been given for second degree murder. Apparently, the defense did argue that a solicitation instruction was warranted. The petitioner appealed the denial of his motion for new trial through a direct appeal; however, the issue of lesser-included offenses was not raised. Id. at *1. This court affirmed the conviction. Id.

The petitioner subsequently filed a petition for post-conviction relief alleging that trial and appellate counsel were ineffective based on their failure to address or preserve whether second degree murder should have been charged as a lesser-included offense of felony murder. This petition was denied by the post-conviction court, and we reversed and remanded for a hearing on the issues presented. See Montea Wilson v. State, No. W2004-01881-CCA-R3-PC, 2005 WL 2333588, at *1 (Tenn. Crim. App., at Jackson, Sept. 21, 2005).

Upon remand, the petitioner's case languished. An evidentiary hearing was held in April 2006 before the post-conviction judge, wherein trial counsel testified, but co-counsel was unavailable due to health issues. At the April 2006 hearing, when questioned about why he did not request an instruction for second degree murder, trial counsel responded:

-11-

> There was a time back when second-degree murder was not a lesser-included
> of felony murder. We would generally ask for that on the premeditated count;
> but as for the felony murder count, if we didn't, and the record doesn't reflect
> we did, I don't have any reason why we didn't.

He could not recall if he had read the cases of State v. Burns, 6 S.W.3d 453 (Tenn. 1999),
State v. Laconia Bowers, No. E1999-00170-CCA-R3-CD, 2000 WL 15020 (Tenn. Crim.
App., at Knoxville, Jan. 11, 2000), or State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), before
trial. He believed that he requested an instruction for the lesser-included offense of
facilitation. He stated that he would have requested an instruction for second degree murder
if he felt it was warranted.

Trial counsel said he was assisted by co-counsel in representing the petitioner and
worked on the case for "[m]any months–probably years." Their primary theory of defense
was that the petitioner was not present when the robbery occurred. Trial counsel stated, "The
defense was much more Mr. Wilson wasn't responsible for anything, more than he was
responsible for something lesser." He said the facilitation instruction was requested because
the petitioner might have aided the robbery. Trial counsel testified that co-counsel handled
the appeal; however, he consulted during the appellate process. He could not recall if he read
State v. Ely, 48 S.W.3d 710 (Tenn. 2001), before the appeal was filed.

Following the hearing, the post-conviction judge took the case under advisement but
retired before issuing a ruling in the case. The case was then transferred to another judge,
who recused himself. Almost two years later, the case was transferred to the final post-
conviction judge. Given the lengthy period of time that had passed, the final post-conviction
judge provided the petitioner with the option of a new evidentiary hearing, which he
declined. The judge then reviewed the testimony of the April 2006 hearing, among other
things, before entering an order denying post-conviction relief regarding the ineffectiveness
of trial counsel and granting a delayed appeal on the issue of whether second degree murder
should have been charged as a lesser included offense of felony murder. The order stated:

> A review of the relevant transcripts indicate[s] that trial counsel was effective
> in their defense of the petitioner during the trial. The original post[-]
> conviction court found that the trial counsel did an effective job based on the
> law and this Court finds nothing in the proof or transcripts to counter that
> finding. The petitioner has failed to carry his burden of proof as to how his
> attorneys were ineffective during the course of trial. However, this Court finds
> that the issue of the lesser[-]included offense of Murder Second Degree should
> have been charged by the trial court. Although trial counsel was effective in
> the representation of the petitioner during the trial of the case and had no
> obligation to request the charge of Murder Second Degree as a lesser[-

-12-

]included offense they should have preserved the right to have that issue reviewed on appeal by raising it during the Motion for a New Trial. The law at the time of the trial required the trial court to charge all lesser[-]included offenses and Murder Second Degree had been previously established by the Supreme Court to be a lesser[-]included offense of Felony Murder. Trial counsel can make a strategic decision not to request a specific lesser[-]included offense or to argue that point during closing argument and that decision should not be challenged as ineffective assistance of counsel. However, once the jury decided that the petitioner was guilty the trial counsel should have protected the petitioner's right to litigate the trial court's failure to properly instruct the jury on lesser[-]included offenses by raising the point during the Motion for a New Trial. In light of the overwhelming body of law which has since been decided[,] this Court is of the opinion that the omission by the trial court would appear to be plain error and trial counsel's failure to protect that right on appeal was ineffective.

The post-conviction court found that a delayed appeal was the proper remedy and allowed the petitioner to file a motion for new trial. It stated, "This Court is not in a position to determine if the omission by the trial court was plain error or was harmless, therefore this court cannot determine if trial counsel's actions were prejudicial to petitioner's rights requiring a new trial." The post-conviction court directed that the motion for new trial address whether second degree murder should have been charged as a lesser-included offense. The petitioner filed a timely notice of appeal.

## ANALYSIS

**I. Ineffective Assistance of Counsel**. The petitioner claims trial counsel were ineffective based on their failure to request an instruction for second degree murder. He argues that trial counsel should have asked for the instruction even though the trial court was required to instruct the jury on the lesser-included offenses of felony murder. He further contends that trial counsel were ineffective by failing to allege in the motion for new trial that the trial court erred by not instructing the jury on second degree murder as a lesser-included offense of felony murder. In response, the State cites to numerous decisions from this court which conclude that counsel was under no duty to request the instruction. The State also argues that trial counsel made a strategic decision not to ask for the instruction, thereby negating any obligation to request the instruction. We agree with the Petitioner.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901, n.3 (Tenn. 1992)), perm. to appeal denied (Tenn. Nov. 2, 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of

-14-

reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome."' Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

The post-conviction court found that trial counsel were effective in representing the petitioner during trial. It reasoned that trial counsel were under no obligation to ask for the instruction because the trial court was responsible for instructing the jury on the lesser-included offenses of felony murder. Before resolving this issue, some discussion of the law governing lesser-included offenses at the time of the petitioner's trial is necessary. The petitioner was tried in February of 2000, and, at that time, the trial court was required "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Wiley v. State, 183 S.W.3d 317, 328 (Tenn. 2006); T.C.A. § 40-18-110(a) (2000).[2] The Tennessee Supreme Court discussed the effect of not requesting an instruction for a lesser-included offense in State v. Page, 184 S.W.3d 223 (Tenn. 2006). The Court stated:

> Under this prior version of section 40-18-110, a defendant was not required to request a lesser-included instruction to assign as error the trial court's failure to give such instruction. Therefore, all a defendant need do to assign error to a trial court's failure to instruct on a lesser-included offense was to raise that issue on appeal.

Id. at 229. In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), the Court defined the applicable standard for determining whether an offense constituted a lesser-included offense. Id. at 466-

---

[2]Section 40-18-110(a) was subsequently amended. The amendments became effective on January 1, 2002. It now reads:

When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

67. It also set forth a two-step analysis for determining if a lesser-included offense instruction should be given in a particular case. It stated:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469.

This court applied the Burns standard in the context of felony murder in State v. Laconia Lamar Bowers,[3] No. E1999-00170-CCA-R3-CD, 2000 WL 15020, at *4 (Tenn. Crim. App., at Knoxville, Jan. 11, 2000), aff'd, State v. Ely, 48 S.W.3d 710 (Tenn. 2001). Laconia Lamar Bowers was decided approximately one month before the petitioner's trial. It held that second degree murder was a lesser-included offense of felony murder. The court did not conduct the two-part Burns analysis to determine whether an instruction for second degree murder was warranted. It did, however, conclude that the trial court did not err by instructing the jury on second degree murder. Id. This decision was affirmed by the Tennessee Supreme Court in Ely, which was decided after the petitioner's trial. 48 S.W.3d at 722-24. The Court in Ely performed the two-step analysis in Burns and determined the evidence justified an instruction on second degree murder. Id.

In the present case, the post-conviction court correctly stated that second degree murder was a lesser-included offense of felony murder. Burns required the post-conviction court to first determine whether the offense was a lesser-included offense, and then conduct a two-part analysis to decide if the evidence justified an instruction on the lesser-included offense. This two-part analysis was absent from the post-conviction court's order. Despite this omission, the State concedes that an instruction for second degree murder was warranted; however, it argues that trial counsel had no obligation to request the instruction. In support of its argument, the State refers to the case of Ronald Donnell Moore v. State, in which this court stated:

> Because the trial court had a mandatory duty to instruct the jury regardless of a request to do so, this court has consistently held that trial counsel was not

---

[3]This issue is now specifically addressed by section 40-18-110(g)(1), which states: "Second degree murder is a lesser included offense of first degree murder as defined in § 39-13-202." This section became effective on January 1, 2002.

ineffective for failing to request an instruction on a particular lesser[-]included offense.

No. W2008-00034-CCA-R3-PC, 2009 WL 1424186, at *9 (Tenn. Crim. App., at Jackson, May 20, 2009) (citations omitted), perm. to appeal denied (Tenn. Oct. 19, 2009). We acknowledge, as did Ronald Donald Moore, that this court has repeatedly held the same. See Ellis Junior Burnett v. State, No. M2007-00572-CCA-R3-PC, 2008 WL 555711, at *11 (Tenn. Crim. App., at Nashville, Feb. 29, 2008), perm. to appeal denied (Tenn. Aug. 25, 2008); Larry Johnson v. State, No. W2006-00345-CCA-R3-PC, 2007 WL 2120184, at *10 (Tenn. Crim. App., at Jackson, July 24, 2007); Jerome Sawyer v. State, No. W2005-01813-CCA-R3-PC, 2007 WL 778828, at *20 (Tenn. Crim. App., at Jackson, Mar. 15, 2007), perm. to appeal denied (Tenn. Aug. 13, 2007); Chivous Robinson v. State, No. E2005-01036-CCA-R3-PC, 2006 WL 1381511, at *6 (Tenn. Crim. App., at Knoxville, May, 19, 2006), perm. to appeal denied (Tenn. Oct. 2, 2006); Jeffery Lee Miller v. State, No. M2003-02841-CCA-R3-PC, 2005 WL 901130, at *5 (Tenn. Crim. App., at Nashville, Apr. 19, 2005); Terrance L. Turner v. State, No. M2002-02429-CCA-R3-PC, 2004 WL 587636, at *5 (Tenn. Crim. App., at Nashville, Mar. 25, 2004).

The petitioner however relies primarily on the Tennessee Supreme Court's decision in Wiley, 183 S.W.3d at 330. The petitioner in Wiley was also convicted of felony murder. Id. at 320. He claimed counsel was ineffective based on his failure to request an instruction for second degree murder and raise the issue in the motion for new trial. Id. at 330. The Court first determined that the trial court was obligated to instruct the jury on second degree murder. Id. In making this determination, the Court relied on its decision in State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996). The petitioner's case was tried before the Court's decision in Burns. Id. at 326. At the post-conviction hearing, counsel could not recall why second degree murder was not charged as a lesser-included offense. Id. at 330. The Court concluded that counsel was ineffective and granted the petitioner a new trial. Id. It stated:

> We conclude that counsel was deficient in failing to request an instruction on second degree murder and in failing to preserve the issue for appeal. At the time of the petitioner's offense, felony murder required a "reckless" killing in the commission or the attempted commission of an enumerated felony, Tenn. Code Ann. § 39-13-202(a)(2), and second degree murder required a "knowing killing of another." Tenn. Code Ann. § 39-13-210. Moreover, at the time of the petitioner's trial, the trial court was required to instruct the jury on second degree murder as a lesser grade offense under this Court's decision in Trusty. 919 S.W.2d at 310. Although the trial court was required to instruct the jury on this lesser offense even without a request by counsel, see Tenn. Code Ann. § 40-18-110, trial counsel failed to

-17-

object, failed to raise the error in a motion for new trial, and failed to take any other step toward preserving the issue for appeal.

We also conclude that counsel's deficiency was prejudicial. As the trial court specifically found in the post-conviction proceeding, the evidence at trial supported an instruction on second degree murder: "Given the facts in this case, including the petitioner's statement to the police, and the scene of the crime, a reasonable juror might conclude that the petitioner was guilty of second degree murder." See State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002). As a result, the failure to instruct on second degree murder as required at the time under Trusty would have been reversible error on direct appeal if the issue had been preserved.

In addition, had the issue been preserved and raised on appeal, the petitioner's direct appeal would have been in the appellate "pipeline" for review under Burns. As discussed above, second degree murder is a lesser-included offense of the present version of felony murder under Burns. See Ely, 48 S.W.3d at 720. Moreover, second degree murder was also a lesser-included offense of the former version of felony murder because the mental state for felony murder was the "intent" to commit the underlying felony (resulting in a reckless killing), and the mental state for second degree murder was a "knowing" killing. As a result, second degree murder had a "different mental state indicating a lesser kind of culpability" than did the former version of felony murder. See Burns, 6 S.W.3d at 461; see also Ely, 48 S.W.3d at 720-21. Since the evidence supported an instruction on second degree murder, the failure to instruct on second degree murder would have been reversible error under Burns.

Id. at 330-31.

In the present case, the petitioner also points to the concurring opinion written by Presiding Judge Joseph M. Tipton in Ellis Junior Burnett v. State, 2008 WL 555711, at *10-11 (Tipton, P.J., concurring). Presiding Judge Tipton stated:

[Z]ealous advocacy required of an attorney in defending a criminal case is not lessened by the duties imposed upon other participants in the criminal justice system. In fact, counsel's task will involve attempting to ensure that the trial judge and the prosecution comply with the duties imposed upon them by statute, rule, or case law. Ensuring that appropriate instructions regarding lesser[-]included offenses are given is a basic duty of counsel. I am bolstered in my belief by our supreme court's holding in Wiley v. State, 183 S.W.3d 317

(Tenn. 2005), involving post-conviction relief from a felony murder conviction. Although noting that the trial court was obligated to instruct the jury regarding proven lesser[-]included offenses, the court held that "counsel was deficient in failing to request an instruction on second degree murder and in failing to preserve the issue for appeal." Id. at 331.

Id. at *11 (Tipton, P.J., concurring).

Given the facts and circumstances of this case, we disagree with the post-conviction court and conclude that the petitioner was deprived the effective assistance of counsel at trial. Trial counsel, though not obligated to request the instruction, was deficient in failing to request an instruction on second degree murder and in failing to preserve the issue for appeal. Our decision is bolstered by State v. Brown, 311 S.W.3d 422, 434 (Tenn. 2010), wherein the Tennessee Supreme Court considered the effect of a jury instruction that omitted the lesser-included offenses of felony murder. The Court categorized the error as a non-structural constitutional error, meaning the error required reversal unless the State proved beyond a reasonable doubt that it was harmless. Id. The Court found that the error was not shown to be harmless, and therefore it granted the defendant a new trial. Id. at 435. Accordingly, we will review the evidence to determine if the error was harmful to the petitioner.

Based on the evidence adduced at trial, we cannot conclude this error was harmless. Here, there was no dispute that an attempted robbery occurred which resulted in the death of the victim, Cecil Goodman. The record also showed that the petitioner gave the other individuals involved in the offense a gun on the day of the murder. The petitioner also provided a detailed statement in which he admitted that he knew the others involved intended to rob the check cashing store. One of his co-defendants testified that the petitioner planned the robbery, arranged everyone's participation, and discussed a four way split of the proceeds. The attempted robbery ensued once the petitioner gave the code word "A-okay". The victim was fatally shot while the petitioner was acting as a look-out for the others. A co-defendant who witnessed the shooting stated that the victim panicked and threw a box at another co-defendant. The victim was shot after wrestling with a co-defendant. The petitioner argues that these facts support a charge of second degree murder under a theory of criminal responsibility just as much as a charge of felony murder. Given this proof, we are constrained to agree. Even though the evidence is clearly sufficient to support a verdict of felony murder, his conduct also showed that he was criminally responsible for second degree murder. See, e.g., Quinton Sanders v. State, No. W2001-01927-CCA-R3-CD, 2004 WL 221217, at *3 (Tenn. Crim. App., at Jackson, Jan. 30, 2004), perm. to appeal denied (Tenn. June 14, 2004). The jury in this case was deprived of the option of considering whether this offense applied, which impaired their truth-ascertainment function. Consequently, we cannot say the failure to instruct the jury on the lesser-included offense of second degree murder was harmless beyond a reasonable doubt. Therefore, we reverse the

petitioner's conviction for first degree felony murder and remand this case to the Shelby County Criminal Court for a new trial on that charge wherein the jury is instructed on lesser-included offenses in accordance with this opinion.

Notwithstanding our holding above, we will address the State's argument that trial counsel provided effective assistance because they made a strategic decision not to request the instruction. We believe this argument is misplaced. The Tennessee Supreme Court has stated:

> In Bolden, [979 S.W.2d 587 (Tenn. 1998)] we emphasized the mandatory nature of the duty to instruct on lesser-included offenses and that "neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged." Id. at 593 (quoting People v. Barton, 12 Cal. 4th 186, 47 Cal. Rptr. 2d 569, 906 P.2d 531, 536 (1995)).

Brown, 311 S.W.3d at 431. We also question the benefit of denying the jury the opportunity to consider the lesser-included offense in this case. See Bolden, 979 S.W.2d at 593 ("To permit this would force the jury to make an 'all or nothing' choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser[-]included offense established by the evidence.") (quoting Barton, 906 P.2d at 536); see also Chivous Robinson, 2006 WL 1381511, at *5 n. 3 (questioning "the wisdom of gambling upon an all-or-nothing approach"). The transcript from the post-conviction hearing shows that trial counsel may have made strategic decision not to ask for the instruction; however, this does not relieve counsel's obligation to preserve the issue in a motion for new trial for appellate review.

**II.  Delayed Appeal**.  Our previous decision regarding trial counsel's ineffective assistance renders this issue moot. However, in the event of further appellate review, we will address it in detail.  The petitioner argues the post-conviction court should have granted a new trial rather than a delayed appeal.  He maintains that a new trial was the proper remedy because trial counsel did not request an instruction for second degree murder or preserve the issue for appeal in the motion for new trial.  The petitioner also contends that appellate counsel should have raised the issue on direct appeal as plain error.  The State agrees that a delayed appeal should not have been granted in this case.  It reasons, however, that the post-conviction court failed to consider whether the petitioner was prejudiced by appellate counsel's deficient performance.  For the reasons set forth below, we agree with both parties and remand to the post-conviction court to determine whether the petitioner was prejudiced by counsel's failure to preserve and address on direct appeal second degree murder as a lesser-included offense of felony murder.

Tennessee Code Annotated section 40-30-213(a) of the Post-Conviction Procedure Act provides that a post-conviction court may grant a delayed appeal after finding that the defendant was unconstitutionally denied an opportunity to appeal his original conviction. T.C.A. § 40-30-213(a)(1). Supreme Court Rule 28, § 9 governs the procedure to be applied and allows either a trial court or the Court of Criminal Appeals to grant a delayed appeal as post-conviction relief where the petitioner, through no fault of his own, was denied second-tier review following his direct appeal.

Specifically, Tennessee Code Annotated section 40-30-113 states:

(a) When the trial judge conducting a hearing pursuant to this part finds that the petitioner was denied the right to an appeal from the original conviction in violation of the Constitution of the United States or the Constitution of Tennessee and that there is an adequate record of the original trial proceeding available for a review, the judge can:

(1) If a transcript was filed, grant a delayed appeal;

(2) If, in the original proceedings, a motion for a new trial was filed and overruled but no transcript was filed, authorize the filing of the transcript in the convicting court; or

(3) If no motion for a new trial was filed in the original proceeding, authorize a motion to be made before the original trial court within thirty (30) days. The motion shall be disposed of by the original trial court as if the motion had been filed under authority of Rule 59 of the Rules of Civil Procedure.

In addition, section 40-30-111(a) states:

If the court finds that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable, including a finding that trial counsel was ineffective on direct appeal, the court shall vacate and set aside the judgment or order a delayed appeal as provided in this part and shall enter an appropriate order and any supplementary orders that may be necessary and proper. . . .

Regarding this issue, the post-conviction court ordered a delayed appeal because it found "the issue of the lesser included offense of Murder Second Degree should have been charged by the trial court." It further stated, "This Court is not in a position to determine if the omission by the trial court was plain error or was harmless, therefore this court cannot determine if counsel's actions were prejudicial to petitioner's rights requiring a new trial."

-21-

As previously stated, we disagree with the post-conviction court's remedy of a delayed appeal in this case. We first note that the petitioner has not been denied the right to an appeal from his original conviction. The record shows that a motion for new trial was filed in this case and that the petitioner received a direct appeal as well as second-tier review. Moreover, we infer from the post-conviction court's comments that it believed it was without jurisdiction to make a determination of prejudice.[4] This court has previously held that "before post-conviction relief in the form of a delayed appeal or any other type of relief can be granted to a petitioner, he must show not only that his counsel performed deficiently, but also that the deficiency resulted in prejudice to him." Terry Smithson v. State, No. 88-203-III, 1989 WL 28311, at *3, (Tenn. Crim. App., at Nashville, Mar. 28, 1989) (citing Strickland v. Washington, 466 U.S. 668, 700, 104 S. Ct. 2052, 2071 (1984)). In Smithson, we concluded that it was improper for the post-conviction court to grant a delayed appeal absent a finding and determination that appellate counsel's errors resulted in prejudice to the petitioner. Id. at *3. Because there was no such finding in this case, we would have remanded this matter to the post-conviction court for the purpose of determining whether the petitioner was prejudiced by appellate counsel's failure to address the lesser included offenses on direct appeal.

Based on the foregoing, the judgment of the post-conviction court is reversed. We remand this matter to the Shelby County Criminal Court for a new trial on the offense of first degree felony murder.

 

 

_____
CAMILLE R. McMULLEN, JUDGE

---

[4]We acknowledge that, in the petitioner's original post-conviction hearing, the first post-conviction judge maintained that these issues were "previously determined" because, despite counsel's failure to raise them on direct appeal, this Court could have addressed them for plain error and declined to do so. However, in the first post-conviction appeal, we stressed, "This Court has never ruled on the merits of the petitioner's claims that lesser-included offense instructions should have been given at trial. Therefore, the post-conviction court's ruling that these issues have been 'previously determined' is erroneous." Montea Wilson, 2005 WL 2333588, at *8.