# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 15, 2011

## STATE OF TENNESSEE v. NICHOLAS SHORT

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-B-1035     Steve Dozier, Judge**

---

**No. M2010-01914-CCA-R3-CD - Filed May 7, 2012**

---

A Davidson County jury convicted the Defendant-Appellant, Nicholas Short, of one count of first degree premeditated murder and one count of second degree murder. The trial court merged the convictions and sentenced Short to life imprisonment. The sole issue presented for our review is whether the evidence is sufficient to establish his convictions given Short's theory of self-defense. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the Defendant-Appellant, Nicholas Short.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; Jennifer McMillen and Pamela Anderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** Short was indicted for one count of first degree premeditated murder and one count of first degree felony murder during the perpetration of an especially aggravated robbery. Both counts arose from the homicide of Tyrone Davis, the victim in this case. Short concedes that he fatally shot and killed the victim; however, Short insists that it was in self-defense. He explained at trial that the victim "rushed" him and, in an attempt to resist, Short began "shooting wildly" in the air. The State presented three witnesses who observed Short shoot the victim in the back to refute Short's claim of self-defense.

Brandon Petty, a bail bondsman, testified that on December 9, 2008, he was working the area of Clarksville Pike and 26th Avenue in Nashville, Tennessee. He was driving his car and following his coworkers Tony Smith and David Fletcher, who were in another car. heard gunshots. As Petty turned onto 26th Avenue, he heard gunshots. He looked into a nearby parking lot and saw two men struggling. He saw one of the men, the victim, on his knees and the other man, whom Petty later identified as Short, behind him. The victim looked like he was trying to get away. Petty testified that he saw Short shoot the victim in the back. Petty's car was facing Short, with the car's headlights pointed at Short's face. Petty clearly saw the two men, and nothing obstructed his view. Petty then saw the victim lying face down on the ground and Short bend over. Short pulled the victim's pants down and went through the pockets. Petty got out of his car, drew his weapon, and yelled at Short to drop his gun and to lie on the ground. Short turned, casually walked away, then dropped his coat at the corner of the nearby building and ran. Petty got back in his car and drove in front of Short. Tony Smith and David Fletcher, Petty's coworkers, chased Short on foot approximately 100 to 150 yards, at which point Short stopped. Short would not comply with their commands, and Smith shot Short with a taser. They placed handcuffs on Short and returned with him to the parking lot.

On cross-examination, Petty testified that although it had been raining earlier in the evening, it was not raining when these events occurred. It was dark at the time. The men were at first facing each other, but Petty did not see them "locked together." The victim was "flailing trying to get away." Petty acknowledged that he did not know what happened between the two men before he heard the gunshots. He further acknowledged that he did not see the bullets actually strike the victim.

David Fletcher substantially confirmed the testimony of Petty regarding the events on the night of the offense. He specifically observed Short "standing there with his arm extended out and fire coming from the front of his arm." He also observed Short "maybe searching [the victim] or going through his pockets." On cross-examination, Fletcher conceded that he did not know what happened before he heard the gunshots.

Tony Smith testified consistently with the testimony of Petty and Fletcher. He also saw Short "standing over the [victim] firing rounds into the guy's back" in front of a strip mall. On cross-examination, Smith said that he did not know what happened before he heard gunshots. He saw Short bent over, but he did not see Short's hands in the victim's pockets.

Officer Matthew Grindstaff of the Metropolitan Nashville Police Department (MNPD) testified that he responded to the area of Clarksville Pike and 26th Avenue North. He saw two bonding agents with Short, who was handcuffed. The victim was not on the scene. Officer Grindstaff informed Short of his <u>Miranda</u> rights and arrested Short for the victim's

murder. Grindstaff said that Short did not have any visible cuts or scrapes on his face. He noticed that Short was wearing a pendant and large chain around his neck.

Investigator Lynette Mace with the MNPD identification unit testified that she processed the crime scene, collecting evidence and documenting its location. When she arrived at 7:17 p.m., it was raining, and water was flowing in the parking lot. She speculated that "nature" may have moved some of the evidence before she arrived. Investigator Mace found what appeared to be a blood stain on the parking lot surface, two projectiles fired from a bullet, eight fired shell casings, keys to the victim's car, a cell phone, a lighter, three hats, and a jacket with a gun in the right sleeve. The gun was empty and "in lock-back position," suggesting that it had been fired until empty of ammunition. Investigator Mace created a diagram documenting the locations of these items when she found them. The jacket was around the corner of the building from all the other items. The diagram and a number of photographs depicting the crime scene were admitted as evidence at trial.

Investigator Mace also went to General Hospital, where she photographed a silver Chevrolet. She found what appeared to be blood stains on the back seat and on a rear door handle. She retrieved the victim's clothing at the hospital and took it, along with the evidence found at the crime scene, to the lab. Another detective, Cody O'Quinn, also went to the emergency room and observed Michael Edmondson, a.k.a. Michael Jones, and Joe Don Bradley, a.k.a. "Joe Joe,"[1] standing near a silver Chevrolet "Capri" in the ambulance parking lot. Jones and Bradley were interviewed and provided identical accounts of what happened to the victim.

Rodrickous Hockett, whose nickname was "Meathead," testified that he was the victim's cousin. Hockett was in jail in December 2008, during the same period that Short was in jail. Hockett testified that he knew Short because Short was friends with Hockett's brothers and was frequently at Hockett's house when they were younger. Short told Hockett that he was arrested for shooting Hockett's cousin. Short said that Joe Don Bradley, or "Joe Joe," gave him the gun he used to kill the victim. Hockett also knew Bradley because Hockett "grew up with him."

MNPD Defective Robert Hanson testified that he interviewed Short after his arrest and treatment at the hospital for removal of the taser barbs. Short had no cuts on his face. Based on Detective Hanson's familiarity with Short's voice, he listened to a number of telephone calls placed from the jail and recognized Short as one of the speakers. Portions of the telephone calls were played for the jury and admitted as evidence at trial along with

---

[1]Bradley's name is spelled variously throughout the record as "JoDon," "Jo Don," and "Joe Don." His nickname is similarly spelled variously as "JoJo," "Jo-Jo," and "Joe Joe." We will use "Joe Joe."

transcripts of the calls.  In the first call, which occurred on December 12, 2008, Short spoke with an unidentified male:

> SHORT: Little buddy's people I hit . . . uh, Meathead gonna come holler at you about that you feel me?
>
> [. . . .]
>
> MALE: Yeah, but why'd you hit dude up like that man?
>
> SHORT: Man, he fucked with [Joe Joe] man.
>
> MALE: Joe Joe know what's going on?
>
> SHORT: Don't . . . act like . . . man, I'm gonna handle it . . . cause [Joe Joe] playing me all the way to the left.  He playing everybody to the left like he don't know what's going on. [Joe Joe] the one who set it up Daddy.
>
> MALE: Alright man.
>
> SHORT: Don't say nothing to [Joe Joe] and them cause . . . .
>
> [ . . . .]

Doctor Sandra Thomas of the Davidson County Medical Examiner's Office testified that she reviewed the report and "body diagram" prepared by other doctors after they performed an autopsy on the victim.  Doctor Thomas described three gunshot wounds that the victim suffered.  "Gunshot wound B" was the result of a bullet entering the left side of the victim's back, over the shoulder blade area.  The bullet traveled into the left lung cavity, between ribs, through the lung, and out through the front of the victim's chest in the area of the collar bone.  This bullet traveled slightly upward through the victim's body.  Another bullet caused "gunshot wound C" when it entered the victim's upper back "almost skim[ming] along the . . . back."  It traveled into the right lung cavity, fractured a rib, went through the lower lobe of the right lung and the diaphragm, and hit the liver, right adrenal gland, and the right kidney.  Doctor Thomas described the trajectory of the bullet as left to right, back to front, and downward.  The bullet was recovered from the victim's body.  "Gunshot wound D" occurred when a bullet entered the victim's lower back and traveled into the left lung cavity, through the lower left lung, and through the left side of the diaphragm.  The trajectory of the bullet was right to left, back to front, and downward.  This bullet was also recovered from the victim's body.  None of the gunshot wounds exhibited fouling, the

presence of soot on the skin, or stippling, abrasions or burns caused by ignited gun powder. Doctor Thomas testified that close range gunshot wounds usually exhibit fouling and stippling, but that a victim's clothing can prevent these characteristics.

According to Doctor Thomas, gunshot wound D would be consistent with the victim's being shot while on his knees by a person standing behind him. Gunshot wound C would be less consistent with this scenario due to the steep angle of travel, but Doctor Thomas testified that it would be consistent with the shooter standing above the victim.

In addition to these gunshot wounds, Doctor Thomas described several abrasions on the victim's body. There were abrasions on the right side of the forehead, the right side of the bridge of the nose, and the heel of the right hand. Doctor Thomas testified that these abrasions were consistent with the victim's falling on asphalt. The victim also had raw abrasions on both knees, consistent with the victim's crawling or walking on his bare knees on asphalt. Due to the fresh appearance of these abrasions, Doctor Thomas believed that they occurred very close to the time of death. Doctor Thomas testified that the victim's body did not exhibit black eyes or bruising on his hands that would be consistent with a fist fight. A diagram denoting the location of all the victim's wounds and a number of photographs depicting the wounds were displayed to the jury and admitted as exhibits at trial. The cause of the victim's death was determined to be multiple gunshot wounds, and the manner of death was homicide.

On cross-examination, Doctor Thomas testified that both of the bullets that caused gunshot wounds C and D traveled downward in the victim's body approximately one foot. Doctor Thomas acknowledged that bullets can change trajectory if they hit bone or other materials in the body. The bullet that caused gunshot wound B and traveled upward through the victim's body did not hit bone. Doctor Thomas testified that gunshot wounds C and D could be consistent with a scenario in which the shooter reached over the victim's back and fired downward.

Special Agent Don Carman, a forensic scientist in the Tennessee Bureau of Investigation firearms identification unit, identified the pistol found at the crime scene as a Sig Sauer .45 caliber semiautomatic. He determined that the two bullets found at the crime scene and the two bullets retrieved from the victim's body were all fired from the pistol. He also determined that the eight casings found at the crime scene were fired by the pistol. He examined the victim's clothing and, based on the concentration of gun powder residue near the bullet holes, determined that the gun was not in direct contact with the victim when it was fired but that it was less than twenty-four inches away at the time.

On cross-examination, Agent Carman testified that the two bullets found at the crime scene had a symmetric, flattened shape, which was consistent with having been shot at a perpendicular angle into a hard surface such as asphalt.

Short testified in his own behalf that on the night of the offense, his friend Dejuan gave him a ride. Short was armed with a "four-five" gun that night, and he took the gun with him "when [he] [went] to places that [he was] not from." Dejuan and Short stopped at the store at Clarksville Pike and 26th Avenue North to look at clothes. While Dejuan was inside the store, Short stepped outside to smoke a cigarette. The victim, whom Short did not know and had never seen before, walked toward Short. The victim asked Short about his chain and medallion and inquired where he bought them. The victim held the medallion with one hand. Short drew his firearm and said to the victim, "[B]ack up, homeboy." The victim "rushed" Short. Short tried to back up, but the victim grabbed him in a "bear hug." Short, who had his right arm free, began "shooting wildly" over the victim's back.

Short testified that he was trying to hit the victim in the leg in the hope that the victim would let go. Both men fell to the ground, and Short continued shooting as they fell. Short said that his jacket was slipping off while the two were "tussling" and falling to the ground. Once they hit the ground, Short did not fire any more shots. Short realized he shot the victim when the victim did not rise from the ground. Short denied shooting the victim after he got up from the ground or while the victim was lying on the ground. When Short got up, he pulled up his pants, which had fallen down to around his knees, and bent over to put on a shoe that had come off. As he did so, Short saw the armed "bounty hunters" and ran. He stopped in a driveway when he saw a police car nearby.

Short testified that he shot the victim because the victim rushed him after Short told the victim to back away. He feared that the victim would shoot him if the victim were to get the gun in the fight. Short explained that he emptied the gun because he continued shooting until they were loose of each other. He did not intend to kill the victim. Short denied going through the victim's pockets or attempting to rob the victim. Short testified that his mother had recently died, leaving him an inheritance, and he had no reason to rob the victim.

Short testified that his previous statement to the police was a lie. He told the police that he saw a gun in the victim's pocket, reached in the pocket, and began firing. Short testified that the victim did not have a gun. He explained that he lied because he realized he "was the one in the wrong" and was trying to craft a more favorable story for himself. Short testified that the victim was "just asking me about a chain," and he did not know if the victim was going to do anything to him.

Short denied being given the gun by Bradley or that they had pre-arranged the confrontation or murder. Short explained the jail telephone call in which he said that he shot the victim because the victim had done something to "Joe Joe":

> I was asked why did I shoot him and I started to say one thing, but ended up just saying down there fucking with [Joe Joe], like I was just down there fucking with [Joe Joe] and this all happened. Not because [the victim] messed with [Joe Joe] but me in general down there.

Short said that he realized he was wrong and was looking for someone to blame. He told different stories to shift the blame off himself.

Short testified that earned his nickname "Shooter," from "[s]hooting basketball all the time."

On cross-examination, Short acknowledged that he fired the pistol at least eight times and that he knew what would happen each time he pulled the trigger. He testified that he previously lied and told a detective that his nickname was not "Shooter" because "what [the detective] was going to ask [Short] about and the nickname didn't go well together." He acknowledged that he shot an unarmed man. He said, "I just jumped to the wrong conclusion and I'm sorry."

Following the proof at trial, the jury convicted Short on count one of first degree premeditated murder and on count two of second degree murder, a lesser included offense of felony murder. The trial court merged the convictions and imposed a sentence of life imprisonment. This timely appeal followed.

**Analysis.** Short argues the evidence is insufficient to support a verdict of guilt beyond a reasonable doubt on the convictions of first and second degree murder. He asserts that the evidence instead supports his theory of self-defense and is inconsistent with the testimony of the State's witnesses. The State responds that the evidence was sufficient to support the jury's guilty verdict on these offenses. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states,

"Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). The statute defines "premeditation":

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). A person's actions are "intentional" if it is the person's "conscious objective or desire to . . . cause the result." Id. § 39-11-106(a)(18).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992)). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after

the killing" may support the existence of premeditation. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). In addition, the "infliction of multiple wounds" indicate premeditation, State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (citing Brown, 836 S.W.2d at 542), as do "the shooting of the victim after he had turned to retreat or escape . . . and the defendant's failure to render aid to the victim," State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Finally, the jury may infer premeditation from the defendant's plans related to the murder that occur prior to the killing, from evidence regarding the defendant's motive, and from the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

Viewed in the light most favorable to the State, the evidence sufficiently established premeditation and intent necessary to convict Short of first degree murder. According to the State's witnesses, the victim appeared to be trying to escape when Short fired repeatedly into the victim's back. Short fired the gun until it was empty, at least eight times, and inflicted multiple wounds on the victim. In addition, the telephone calls from the jail revealed that the killing was the result of a prior arrangement between Short and Bradley. In one telephone call, Short specifically says, "[Joe Joe] the one who set it up." Short further explained that the killing was because the victim had "f----- with [Joe Joe]." Finally, Short conceded at trial that the victim did not have a weapon, demonstrating that Short used a deadly weapon against an unarmed victim.

Most importantly, the eyewitnesses to the shooting testified that the victim appeared to be trying to escape as Short fired repeatedly into the victim's back. Although Short argues, as he did at trial, that the evidence, especially Doctor Thomas's testimony on the trajectory of the bullets, better supported his account of the events, questions of the credibility of witnesses, the weight and value of the evidence, and the inferences to be drawn from the evidence are in the purview of the jury. Bland, 958 S.W.2d at 659 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). By convicting Short of first degree murder, the jury clearly rejected his account of what happened. We will not second-guess the jury's determinations on these matters. Id. The facts and circumstances surrounding this offense were sufficient to allow the jury to infer that the killing was premeditated and intentional. We conclude, therefore, that the State offered sufficient evidence for any rational trier of fact to find Short guilty of first degree murder beyond a reasonable doubt.

We additionally note that the trial court properly merged Short's convictions of first degree premeditated murder and second degree murder as charged in counts one and two of the indictment. State v. Kiser, 284 S.W.3d 227, 234 (Tenn. 2009) (holding "merger of multiple convictions of first degree murder involving a single victim"). However, merger does not eliminate appellate review of the second degree murder. State v. Adam Clyde

Braseel, No. M2009-00839-CCA-R3-CD, 2010 WL 3609247, at \*8 (Tenn. Crim. App. at Nashville, Nov. 18, 2009), perm. app. denied (Tenn. Feb. 17, 2011) (noting "[lesser offense] conviction is not extinguished; it simply mergers into the [greater offense] conviction for a single judgment of conviction); see also State v. Justin Brian Conrad, No. M2008-01342-CCA-R3-CD, 2009 WL 3103776, at \*9 (Tenn. Crim. App., at Nashville, Sept. 29, 2009), perm. app. denied (Tenn. Feb. 22, 2010)). Therefore, we will also address the sufficiency of Short's conviction for second degree murder in the event of further review. Id.

A person is guilty of the offense of second degree murder, as relevant here, upon committing a knowing killing of another. T.C.A. §39-13-210 (a) (1).

> '[k]nowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

T.C.A. §39-11-302(b). "The proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused 'knew that his or her actions were reasonably certain to cause the victim's death.'" See State v. Parker, 350 S.W.3d 883, 904 (Tenn. 2011) (citing State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010)).

We conclude that there was more than sufficient evidence for a reasonable jury to have found a knowing killing of the victim beyond a reasonable doubt. There were three eyewitnesses to the killing, all of whom observed the unarmed victim attempting to escape. Short conceded at trial that he shot the victim, a minimum of eight times, knowing the consequences each time he pulled the trigger. We have also previously concluded that there was sufficient proof of premeditation and intent in this case. Proof that Short intentionally caused the killing sufficed to prove that he knowingly caused the killing. Id. § 39-11-301 (a) (2) ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally."). Short is not entitled to relief.

**CONCLUSION**

Upon review, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE